















KAT    10/19/01    13:57

3:01-M -02472   USA V. ALBA

*1*

*CRCMP.*



ORDERED SEALED    unsealed 10/19/018

01 OCT 17 AM 8 21

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Magistrate's Case No. '01 mg 2472 |
| | ) | |
| Plaintiff, | ) | COMPLAINT FOR VIOLATION |
| | ) | |
| v. | ) | 21 U.S.C., §§ 846 and 841(a)(1) |
| | ) | Conspiracy to Manufacture and |
| DENNIS LOUIS ALBA, | ) | Distribute a Controlled Substance |
| MARK STEPHEN FORRESTER, | ) | (Ecstasy) |
| DONALD LEE WALTERS, | ) | |
| KENNETH ARTHUR CUTLER, | ) | |
| TED FRANK LEBLANC, | ) | |
| THOMAS LILIUS, | ) | |
| JASON WOODRUFF GALANIS, | ) | |
| DEREK MEYER GALANIS, | ) | |
| WALTER CRAIG FORRESTER, | ) | |
| KARL VINCENT TAMEZ, | ) | |
| DEAN EDWARD BOWEN, | ) | |
| DAVID KAZUMI WADA, | ) | |
| LAURA LEE ORTEGA, | ) | |
| JUAN CHAVEZ, | ) | |
| AARON LEON LITTERAL, | ) | |
| RAFAEL HERNANDEZ, | ) | |
| ISRAEL HERNANDEZ, | ) | |
| MIGUEL CHAVEZ, | ) | |
| LISA GENE AARHUS, | ) | |
| HOBART HUSON, | ) | |
| BRIAN CHAPMAN, | ) | |
| MARCO ESTRELLA-SOLANO, | ) | |
| MARTIN GOMEZ-MARISCAL, | ) | |
| DENISE KELLIE FRENCH, | ) | |
| | ) | |
| Defendants. | ) | |

The undersigned complainant being duly sworn states:

Beginning in or about November, 2000, and continuing up to and including October, 2001, within the Southern District of California, and elsewhere, DENNIS LOUIS ALBA, MARK STEPHEN FORRESTER, DONALD LEE WALTERS, KENNETH ARTHUR CUTLER, TED FRANK LEBLANC, THOMAS LILIUS, JASON WOODRUFF GALANIS, DEREK MEYER GALANIS, WALTER CRAIG FORRESTER, KARL VINCENT TAMEZ, DEAN EDWARD BOWEN, DAVID KAZUMI WADA, LAURA LEE ORTEGA, JUAN CHAVEZ, AARON LEON LITTERAL, RAFAEL HERNANDEZ, ISRAEL HERNANDEZ, MIGUEL CHAVEZ, LISA GENE AARHUS, HOBART HUSON, BRIAN CHAPMAN, MARCO ESTRELLA-SOLANO, MARTIN GOMEZ-MARISCAL, DENISE KELLIE FRENCH, and others, did knowingly and intentionally conspire together, and with each other, and with other persons known and unknown, to manufacture and distribute a controlled substance, to wit, Methylenedioxyamphetamine ("MDA"), also known as "ecstasy," a Schedule I Controlled Substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

And the complainant states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

GREGORY D. COFFEY
Special Agent, Drug Enforcement Administration

SUBSCRIBED TO AND SWORN before me
on this _17th_ day of October 2001.

NITA L. STORMES
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, GREGORY D. COFFEY, being duly sworn, declare and state:

## INTRODUCTION

1.     I am a Special Agent (SA) with the United States Drug Enforcement Administration (DEA) and have been so employed for approximately three years. I am currently assigned to the San Diego Field Division Clandestine Laboratory Enforcement Group. In December, 1997, I completed the 17 week Basic Agent Training course at the DEA Academy in Quantico, Virginia. I have also received formal training in the investigation of Clandestine Laboratories. Prior to becoming a Special Agent with the DEA, I was employed as a forensic chemist with the DEA for approximately six years. As a DEA forensic chemist, I was trained to identify various controlled substances through chemical analysis; my training also included the identification of chemicals used to manufacture controlled substances, including methamphetamine and MDA/MDMA, commonly known as "ecstasy." In addition to identifying controlled substances, I am also very familiar with the methods used to manufacture controlled substances, including methamphetamine and ecstasy.

2.     I have been involved in at least ninety narcotics related investigations involving the importation, distribution, manufacture and/or growing of various illegal substances including heroin, cocaine, methamphetamine, ecstasy and marijuana.

3.     By virtue of my employment as a Special Agent, I have performed various tasks which include, but are not limited to:

a.     Functioning as a surveillance agent and thereby observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs;

b.     Participating in the tracing of monies and assets gained by drug traffickers from the illegal sale of drugs (laundering of monetary instruments);

c.     Interviewing witnesses, cooperating individuals, and informants relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments); and

d.     Functioning as a case agent which entails the supervision of specific investigations involving the trafficking of drugs and the laundering of monetary instruments.

4. I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation and, in part, based upon information from the following sources:

        a. Oral and written reports about this investigation which I have reviewed;

        b. Physical surveillance conducted by federal agents or local law enforcement agents, which observations have been reported to me either directly or indirectly;

        c. A review of pen register and telephone airtime and call records;

        d. A review of documents seized pursuant to the execution of court-ordered search warrants;

        e. Summaries of conversations and electronic communications intercepted pursuant to court-authorized electronic surveillance orders;

        f. A review of video footage generated from the closed circuit television cameras inside the Escondido laboratory site; and

        g. Statements of cooperating individuals.

5. Except as otherwise noted, the information set forth in this affidavit has been provided to me by DEA and BNE Agents, multi-agency federal, state, and local drug task force officers or other law enforcement officers, including the Swedish National Criminal Investigative Department (SNCID). Unless otherwise noted, whenever in this Affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own observations but rather has been provided directly or indirectly by DEA or BNE agents, or other law enforcement officers who conducted such surveillance.

6. Because this affidavit is being submitted for the limited purpose of seeking the warrants specified below, I have not set forth each and every fact learned during the course of this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested arrest and search warrants.

**REQUESTED ARREST WARRANTS**

7.      Based upon my personal participation in this investigation and on the basis of the above-noted sources of information, I submit that the facts contained in the numbered paragraphs below demonstrate that: from in or about November 2000, and continuing up to and including October, 2001, within the Southern District of California, and elsewhere, the individuals named and identified in the immediately following paragraphs, and others, did knowingly and intentionally conspire together, and with each other, and with other persons known and unknown, to manufacture and distribute a controlled substance, to wit, Methylenedioxyamphetamine ("MDA"), also known as "ecstasy," a Schedule I Controlled Substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

        a.      Dennis Louis ALBA has been identified as a White male, DOB 9/18/49, 6'1", 200 pounds, SSN 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, and currently resides at 3591 Cameo Drive, Apartment #9, Oceanside, California. A criminal history check for ALBA reveals that he has the following arrests and/or convictions: a 1983 felony conviction for conspiracy to distribute a controlled substance (diazepam/amphetamine); and a 1987 felony conviction for conspiracy to distribute a controlled substance. In addition, law enforcement indices reflect that in 1987 ALBA negotiated with a DEA confidential informant and an undercover agent for the purchase of 50 kilograms of ephedrine and 100 gallons of hydrochloric acid, two chemicals used to manufacture methamphetamine.

        b.      Mark Stephen FORRESTER has been identified as a White male, DOB 6/3/52, 5'10", 230 pounds, SSN 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, and is currently living at an unknown location. A criminal records check for FORRESTER reveals that he has the following arrests and/or convictions: a 1975 arrest for possession of a controlled substance for sale; a 1976 felony conviction for possession of a controlled substance; a 1978 arrest for possession of a controlled substance for sale; a 1980 felony conviction for possession of a controlled substance for sale; and a 2000 felony conviction for possession of a controlled substance (MDMA - ecstasy) for sale, and a felony conviction for possession of a controlled substance. I have spoken with NBPD Detective Steve Burdette, who was involved in the investigation

3

which led to FORRESTER'S most recent felony convictions. I have also reviewed the police reports concerning those offenses. During the NBPD investigation, officers learned that FORRESTER was involved in manufacturing methamphetamine, MDMA and MDA. Prior to making those controlled substances, FORRESTER stockpiled the necessary precursor chemicals in a rented storage locker. During a post-arrest statement, FORRESTER admitted that he was involved in facilitating the purchase of chemicals for individuals who were manufacturing methamphetamine. Specifically, FORRESTER stated that he had a business license which enabled him to purchase various precursor chemicals used to make methamphetamine. FORRESTER admitted that he had manufactured methamphetamine in the past, but stated that he had not done so for a number of years. However, FORRESTER stated that during the time period leading up to his arrest he was actively engaged in the sale of Ecstasy (MDMA/MDA). Although FORRESTER was convicted of the above-noted offenses in 2000, he is currently out of custody on a $100,000 bond pending appeal.

       c.     Donald Lee WALTERS has been identified as a White male, DOB 6/20/30, 5'11", 195 pounds, SSN 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, and currently resides at 10420 Fairgrove Avenue, Tujunga, California. A criminal records check for WALTERS reveals that he has the following arrests and/or convictions: a 1955 conviction for lewd and lascivious acts with a minor; a 1973 felony conviction (later expunged) for possession of marijuana for sale; a 1975 arrest for possession of marijuana for sale; and a 1987 felony conviction for conspiracy to import and possess marijuana and travel in interstate and foreign commerce in aid of drug trafficking. WALTERS was sentenced to 20 years imprisonment for the above-noted 1987 offenses and was released from custody in 1995. He completed his supervised release term in August, 2000.

       d.     Kenneth Arthur CUTLER has been identified as a White male, DOB 3/20/54, 6'1", 260 pounds, SSN 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, and currently living at an unknown location. A criminal records check for CUTLER reveals that he has the following arrests and/or convictions: a 1977 arrest for selling 254 pounds of marijuana to an undercover law enforcement officer; a 1988 felony conviction for conspiracy to possess in excess of 5

1  | kilograms of cocaine; and a 1988 felony conviction for possession of an unregistered firearm.
2  | CUTLER received a 10 year sentence for the 1988 convictions; he was released from custody
3  | in April, 1993.

4  |         e.        Ted Frank LeBLANC has been identified as a White male, DOB 4/7/49,
5  | 6'3", 240 pounds, SSN 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 or SSN 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, and currently resides at 169 East
6  | 18th Street, Apartment B, Costa Mesa, California.  A criminal records check for LeBLANC
7  | reveals that he has the following arrests and/or convictions:  a 1971 felony conviction for
8  | possession of dangerous drugs for sale; and felony convictions in 1980 for importation of
9  | marijuana, transportation of marijuana, and sale of marijuana.

10 |         f.        Thomas LILIUS has been identified as a White male, DOB 7/20/68, 5'8",
11 | 160 pounds, and resides in Stockholm, Sweden.  Swedish law enforcement authorities have
12 | informed the DEA, San Diego Field Division, that LILIUS has a criminal record, but those
13 | authorities have not provided any further details regarding LILIUS' criminal history.

14 |         g.        Jason Woodruff GALANIS has been identified as a White male, DOB
15 | 7/16/70, 6'3", 200 pounds, SSN 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, and currently resides at 1518 North Beverly
16 | Drive, Los Angeles, California.  A criminal records check for Jason GALANIS reveals that he
17 | does not have any prior arrests and/or convictions.  Public business records reveal that Jason
18 | GALANIS lists himself as President and Chief Operating Officer of Vianden Capital
19 | Management, L.L.C., 6353 El Camino Real, Suite J, Carlsbad, California.

20 |         h.        Derek Meyer GALANIS has been identified as a White male, DOB
21 | 6/13/72, 5'9", 195 pounds, SSN 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, and currently resides at 828 Stratford Court, Del
22 | Mar, California.  A criminal records check for Derek Galanis reveals that he does not have any
23 | prior arrests and/or convictions.

24 |         i.        Walter Craig FORRESTER has been identified as a White male, DOB
25 | 10/21/55, 6'1", 185 pounds, SSN 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, and currently resides at 43255 Benton Road,
26 | Hemet, California.  A criminal records check for Walter Forrester reveals that he has the
27 | following arrests and/or convictions: a 1996 arrest for possession of marijuana.

28 |

j.      Karl Vincent TAMEZ has been identified as a White male, DOB 5/9/48, 5'8", 230 pounds, SSN 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, and currently resides at 10321 Katy Lane, Garden Grove, California. A criminal records check for TAMEZ reveals that the has the following arrests and/or convictions: a 1978 felony conviction for a violation of the Georgia controlled substances act; and a 1997 felony conviction for possession of a controlled substance.

k.      Dean Edward BOWEN has been identified as a White male, DOB 10/8/49, 6'3", 220 pounds, SSN 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, and currently resides at 101 Dudley Avenue, Unit #306, Santa Monica, California. A criminal records check for BOWEN reveals that he has the following arrests and/or convictions: a 1982 felony conviction for importing and attempting to import marijuana; a 1983 felony conviction for distribution of marijuana; a 1990 felony conviction for distribution of a controlled substance and possession with intent to distribute a controlled substance; and a 1991 felony conviction for possession with intent to distribute a controlled substance.

l.      David Kazumi WADA has been identified as an Asian male, DOB 8/31/49, 5'10", 200 pounds, SSN 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, and currently resides at 1847 Fallen Leaf Lane, Los Altos, California. A criminal records check for WADA reveals that he has the following arrests and/or convictions: a 1971 arrest for possession and sales of dangerous drugs; a 1974 arrest for assault with a deadly weapon (two counts), assault on Police Officer (two counts), and assault and battery; a 1981 arrest for assault with a deadly weapon; a 1981 arrest for possession of a controlled substance; a 1982 arrest for possession of a controlled substance, carrying a concealed weapon, possession/sale of a dangerous weapon; a 1983 assault with a deadly weapon, battery on a peace officer, carrying a loaded weapon in a public place; a 1994 arrest for possession of a controlled substance for sale, possession of concentrated cannabis; and a 1995 arrest for possession of a controlled substance, felon with firearm, concealed firearm in a vehicle. To date, I have been unable to confirm which of the above-noted arrests, if any, resulted in convictions.

m.      Laura Lee ORTEGA has been identified as a White female, DOB 11/26/60, 5'06", 115 pounds, CDL #N6933970, and currently resides at 3591 Cameo Drive,

Apartment #9, Oceanside, California. A criminal records check for ORTEGA reveals that she does not have any prior arrests and/or convictions.

n.    Juan CHAVEZ has been identified as a Hispanic male, DOB 8/9/80, Alien Registration Number A058906572, and currently resides at 4271 E. Arrieta, La Mesa, California. A criminal records check for CHAVEZ reveals that the does not have any prior arrests and/or convictions.

o.    Aaron Leon LITTERAL has been identified as a White male, DOB 5/16/61, 6'3", 170 pounds, SSN 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, and currently resides at an unknown location. A criminal records check for LITTERAL reveals that the has the following arrests and/or convictions: a 1987 felony conviction for distribution of methamphetamine; and 1988 felony convictions for possession with intent to distribute methamphetamine, conspiracy to manufacture methamphetamine and aiding and abetting the manufacture of methamphetamine.

p.    Rafael HERNANDEZ has been identified as a Hispanic male, DOB 5/9/70, 5'06", 160 pounds, SSN 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, and currently resides at 4382 Rosebud Lane, La Mesa, California. A criminal records check for HERNANDEZ reveals that he has the following arrests and/or convictions: a 1995 arrest for assault with a deadly weapon other than a firearm.

q.    Israel HERNANDEZ has been identified as a Hispanic male, DOB 9/6/78, 5'8", 165 pounds, SSN 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, and currently resides at 4382 Rosebud Lane, La Mesa, California. A criminal records check for HERNANDEZ reveals that he has the following arrests and/or convictions: a 2000 felony conviction for distribution of marijuana.

r.    Miguel CHAVEZ has been identified as a Hispanic male, DOB 7/6/80, 5'8", 162 pounds, black hair, brown eyes, and currently resides at 3113 El Rosario Avenue, Perris, California. A criminal records check for CHAVEZ reveals that he does not have any prior arrests and/or convictions.

s.    Lisa Gene AARHUS has been identified as a White female, DOB 3/28/68, 5'6", 145 pounds, CDL #C4818234, and currently resides at 43255 E. Benton Road, Hemet,

California. A criminal records check for AARHUS reveals that she does not have any prior arrests and/or convictions.

t. Hobart HUSON has been identified as a White male, DOB 1/12/68, 5'11", 165 pounds, SSN 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, and currently resides at 1920 Treble Drive #J1, Humble, Texas. A criminal records check for HUSON reveals that he has the following arrests and/or convictions: a 1996 arrest for attempt to manufacture ecstasy; and a 2001 arrest in Phoenix, Arizona for possession of equipment used to manufacture dangerous drugs and a dangerous drug violation.

u. Brian CHAPMAN has been identified as a White male, DOB 5/8/51, 5'11', 150 pounds, CDL #A0771006, and currently resides at 155 Hyde #407, San Francisco, California. A criminal records check for CHAPMAN reveals that he has the following arrests and/or convictions: a 1974 arrest and conviction in Lima, Peru for possession of a kilogram of cocaine and a large amount of cash; a 1987 arrest and conviction in Paris, France, for possession of 80 grams of cocaine and 20 grams of heroin; an a 1990 felony conviction for possession with intent to distribute 4.2 kilograms of heroin. CHAPMAN is currently on supervised release for the above-noted 1990 felony conviction.

v. Marco ESTRELLA-SOLANO has been identified as a Hispanic male, DOB 12/18/64, 5'11", 220 pounds, SSN 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, and currently resides at a location in Mexico. A criminal records check for ESTRELLA reveals that he has the following arrests and/or convictions: 1988 misdemeanor conviction for willful cruelty to a child and inflicting corporal injury on a spouse; a 1989 conviction for false claim to United States citizenship; a 1992 felony conviction for possession of a narcotic controlled substance; a 1993 felony conviction for illegal reentry after deportation; and a 1997 felony conviction for illegal reentry after deportation.

w. Martin GOMEZ-MARISCAL has been identified as a Hispanic male, DOB 11/22/60, 5'11", 195 pounds, SSN 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, and currently resides at 2610 Noble Canyon Road, Chula Vista, California. A criminal records check for GOMEZ reveals that he does not have any prior arrests and/or convictions.

1            x.     Denise Kellie FRENCH has been identified as a White female, DOB

2  10/10/65, 4'11", 105 pounds, SSN 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, and currently resides at 37651 Regal Blue

3  Trail, Anza, California. A criminal records check for FRENCH reveals that she does not have

4  any prior arrests and/or convictions.

5                     **REQUESTED SEARCH WARRANTS**

6       8.     Based upon my personal participation in this investigation, and on the basis of

7  the above-noted sources of information, I submit that the facts contained in the numbered

8  paragraphs below demonstrate that there is probable cause to believe that the fruits,

9  instrumentalities and evidence of a violation of Title 21, United States Code, Sections 846 and

10  841(a)(1) will be found at the following locations:

11            a.     The premises described as 1175 Industrial Avenue, Suite R, Escondido,

12  California;

13            b.     The premises described as 828 Stratford Court, Del Mar, California;

14            c.     The premises described as 3591 Cameo Drive, Apartment #9, Oceanside,

15  California;

16            d.     The location described as U-Haul Storage, Unit 2606, 6175 Paseo Del

17  Norte, Carlsbad, California; and

18            e.     The location described as American Mini Storage, 1440 W. Mission Road,

19  Unit D-131, Escondido, California.

20

21        **FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE**

22                 **INVESTIGATION OVERVIEW**

23       9.     Since November, 2000, the San Diego Field Division of the DEA has been

24  conducting an investigation into the ecstasy manufacturing activities of Dennis ALBA and his

25  criminal associates. During the initial stages of this investigation, the Alba Organization's

26  efforts were primarily focused on obtaining the precursor chemicals used to manufacture

27  ecstasy and on establishing a suitable clandestine laboratory site. Ultimately, those efforts

28

1  were successful and the Alba Organization has now established a clandestine laboratory in

2  Escondido, California, where they are currently manufacturing ecstasy.

3        10.    In addition to conventional investigative techniques, the law enforcement officers

4  participating in this investigation have obtained court authorization to conduct wiretaps on a

5  total of nineteen different telephone facilities being used by Alba Organization members and/or

6  associates of the Alba Organization.[1] Law enforcement officers also obtained authorization

7  to intercept electronic communications to and from the Digital Signal Line (DSL) account

8  assigned static IP address 064.172.235.170, which is subscribed to by Infobase Direct 1175

9  Industrial Avenue, Suite R, Escondido, California, and related electronic communications (i.e.,

10  screen capture and keyboard capture on computers accessing the Internet via the above-

11  noted DSL service).[2] The interception of electronic communications and calls to and from the

12  various Target Telephones have provided valuable information about the nature and scope

13  of the Alba Organization's illegal activities.[3]

14        11.    Set forth in the paragraphs below are the facts and circumstances learned during

15  the course of this investigation which demonstrate the ongoing nature of the criminal activities

16  we have been investigating.  I begin with an overview of the significant components of this

17  investigation, followed by an analysis of specific evidence regarding the individuals for whom

18  I am requesting arrest warrants.  The final portion of my affidavit concerns the requested

19  search locations and the evidence I believe will be found inside those locations.

20    A.    **CHEMICAL SHIPMENTS TO THE ALBA ORGANIZATION**

21        13.    To date, we have been able to confirm the Alba Organization's receipt of the

22  following chemical shipments from a company named "Titon," which is based in London,

23

---

24        [1]    In this affidavit, I make reference to the various telephone facilities subject to
25  court-authorized monitoring sequentially as "Target Telephone #1" through "Target Telephone
   #19."

26        [2]    In this affidavit, I make reference to the above-noted intercepts as the "electronic
27  communications" interception.

28        [3]    I have included, where appropriate, my interpretation of intercepted calls and
   electronic communications in parenthesis and/or brackets.  Those interpretations are based
   upon my training and experience, as well as my participation in this investigation.

England: 50 kilograms of 3, 4 Methylenedioxyphenylnitropropene, (3, 4 propene) on November 15, 2000; 106 pounds of Raney Nickel on November 28, 2000; 50 kilograms of Tin Chloride on December 5, 2000; and 32 kilograms of Sodium Borohydride on January 3, 2001. All of those chemicals are used during the ecstasy manufacturing process and there is no legitimate reason for the simultaneous possession of those chemicals.

14.    Intercepted calls have also revealed that the Alba Organization was expecting a sample chemical shipment from Arvee Pharma Private Ltd., a chemical company in Mysore, India ("Arvee Pharma"). The shipment was sent from Arvee Pharma via Federal Express to a location in Mexico. According to records I obtained from Federal Express pursuant to an administrative subpoena, the shipment was not delivered to the United States because the Alba Organization members were unable to provide Federal Express with the documentation needed to facilitate the delivery of the package.

15.    The Alba Organization has also obtained precursor chemicals from Science Alliance, a business owned by Hobart HUSON. For example, on July 16, 2001, at approximately 9:51 a.m., Dennis ALBA placed a call from Target Telephone #10 to Hobart HUSON. During the call, ALBA asked HUSON about the status of the "drum," which ALBA stated had not yet been delivered. Based upon other intercepted calls and documents seized during a search of HUSON's business, Science Alliance, I believe that ALBA's reference to the "drum" concerned a 55 gallon drum of Dichloromethane, which ALBA had ordered from Science Alliance. HUSON then provided ALBA with the tracking number for the drum of Dichloromethane – HST607612342. In addition, during the last month, agents monitoring the interception of the above-noted electronic communications have intercepted several letters from ALBA to HUSON. The letters reveal that ALBA has been attempting to order various chemicals used during the ecstasy manufacturing process from HUSON and to have HUSON ship those chemicals to a location in Mexico. However, due to state reporting requirements regarding the sale of those chemicals, which HUSON apparently told ALBA he needed to follow, it appears that ALBA may not wish to follow through with his most recent chemical order from Science Alliance.

16.  Most recently, on October 10, 2001, at approximately 12:14 p.m., Dennis ALBA placed a call from Target Telephone #6 to a Federal Express representative. During the call, ALBA stated that he was expecting a shipment from "Lab Glass of Sweden [LILIUS] or his affiliate firm in Great Brittan [LILIUS' contact in England]." ALBA then gave the representative tracking number "499273449330." Agents have confirmed that there are two barrels which were shipped under the above-noted tracking number. The barrels have a total weight of 57.2 kilograms and the bill of lading for those barrels lists their contents as "commodity flavoring." The shipper is listed on the bill of lading as "AMI Unit 7, Blackburn Trading Est., Stanwell, Great Brittan" and the recipient is listed as "Vianden Capital Management, Industrial Materials Brokers, 6253 El Camino Real, Carlsbad, California." Intercepted calls have confirmed that the chemical shipment was arranged by Tomas LILIUS on behalf of the Alba Organization. On October 11, 2001, surveillance agents observed Juan CHAVEZ, Aaron LITTERAL, Israel HERNANDEZ and Dennis ALBA pick up the two barrels containing suspected ecstasy precursor chemical(s) from the Federal Express location in Carlsbad, California. Israel HERNANDEZ and Juan CHAVEZ were then followed from the Federal Express location to the Pay-Low Market in La Mesa, California, where the barrels were temporarily stored before they were brought to the Escondido laboratory site.

B.  **REFINING THE PROCESS USED TO MANUFACTURE ECSTASY**

17.  On November 30, 2000, Mark FORRESTER traveled from Los Angeles, California, to Stockholm, Sweden, where he met with Thomas LILIUS. To confirm the meeting and Mark FORRESTER's travel to Sweden, two DEA agents from the San Diego Field Division accompanied Mark FORRESTER on his flight from Chicago to Stockholm. In Sweden, the two DEA agents met with Swedish law enforcement authorities, who stated that LILIUS was an individual they knew to be involved in manufacturing ecstasy. In particular, the Swedish authorities stated that LILIUS specializes in manufacturing controlled substances, such as ecstasy, using non-listed chemicals in order to avoid law enforcement scrutiny of his illegal activities. While in Stockholm, Mark FORRESTER was observed meeting with LILIUS on

1    several occasions. On at least one occasion, Mark FORRESTER and LILIUS were observed

2    carrying chemistry books.

3        18.    Since the above-noted meeting between Mark FORRESTER and LILIUS,

4    intercepted calls, intercepted electronic communications and seized documents have

5    confirmed that the Alba Organization is using chemical "recipes" supplied by LILIUS to

6    manufacture ecstasy. Intercepted calls have also confirmed that the Alba Organization is in

7    the process of refining the ecstasy manufacturing process by conducting relatively small-scale

8    test cooks.[4/] Using those test cooks, Alba Organization members have been making small

9    adjustments in their manufacturing technique, including changing the ratio of chemicals used

10   during the manufacturing process and changing the manner in which various pieces of

11   laboratory apparatus are used during the manufacturing process.

12       C.    **ESTABLISHING A CLANDESTINE LABORATORY SITE**

13       19.    Since February, 2001, the Target Subjects have tried to establish two laboratory

14   sites, both of which were abandoned due to logistical problems with those sites. The first

15   laboratory was located in Tecate, Mexico. However, intercepted calls have confirmed that the

16   Alba Organization abandoned the use of that site because the individuals responsible for

17   operating that laboratory demanded too high a percentage of the final ecstasy

18   production/sales.

19       20.    The second laboratory was located at 43255 E. Benton Road, Hemet, California.

20   However, that laboratory site was abandoned after Aaron LITTERAL brought his girlfriend to

21   that location. According to several intercepted calls, Mark FORRESTER, one of the leaders

22   of the Alba Organization, felt that the Benton Road site was no longer viable because the

23   location had been compromised by LITTERAL.

24       21.    The Alba Organization has now obtained a third location to use as a clandestine

25   laboratory site – a warehouse located at 1175 Industrial Avenue, Patton Industrial Park, Suite

26   R, Escondido, California (the "Escondido laboratory site"). As set forth in more detail below,

27

28   ————————————

        [4/]    I use the term "cook" to refer to the process used to manufacture ecstasy.

1  I know that the Alba Organization is in the process of constructing and using a large-scale

2  clandestine laboratory at the Escondido laboratory site.

3       22.    Intercepted electronic communications have also revealed that ALBA is still

4  considering the possibility of establishing a second laboratory site at an undisclosed location

5  in Mexico.  For example, ALBA recently sent an e-mail to walker505@ziplip.com (Mark

6  FORRESTER) and hazman@ziplip.com (unknown individual(s)), where he wrote: "I have one

7  suggestion, get a hold of the other attorney in Mx (Mario) and let's discuss the transition of

8  operations to that location . . . We may have to still run a portion of the next material here . .

9  . I have been discussing with 'Gameboy' [LILIUS] several method (sic) to produce industrial

10  size loads . . . We need a place, some $$$ and some people that have connections.  Mario

11  is the only person who can help us put it together . . . Most likely we'll need a location as well

12  . . Could actually start that phase in Nov or Dec ----. . . .We'll talk in person . . . . . . . Also:  I

13  may need 5K [$5,000] or 10K here; however if your friend can cash them – call me . . . .

14  Whatever works, but I need to cover some big $$$ – Ya I know you have the attorney; give

15  him 2-3 grand . . . . And let's move on . . . If I don't pay 'gameboy' [LILIUS] & the people in LA

16  . . Well going away to prison may not be that bad . . . BUT on the other hand they have too

17  many friend (sic) everywhere!"

18      D.   **CURRENT STATUS OF THE ALBA ORGANIZATION**

19       23.    On July 27, 2001, August 27, 2001 and September 27, 2001, the Honorable

20  Marilyn L. Huff, Chief United States District Court Judge, Southern District of California, signed

21  orders authorizing the interception of visual, non-verbal conduct and activities via closed circuit

22  television ("CCTV") within the Escondido laboratory site.  In those orders, Judge Huff

23  authorized law enforcement officers to surreptitiously enter the Escondido laboratory site to

24  survey, install and maintain the closed circuit television cameras.  Pursuant to that

25  surreptitious entry authorization, I entered the Escondido laboratory site on July 27, 2001, and

26  observed the Alba Organization's clandestine laboratory.[5]  Based upon my observations, I

27

28        [5]    I have been inside the Escondido laboratory site on several other occasions since July 27, 2001.  As required by the orders authorizing those entries, the Court was provided with notice of those entries.

1  believe that the Alba Organization's laboratory is capable of producing large amounts of

2  ecstasy. Set forth below is a description of the layout of the Escondido laboratory site and a

3  description of the clandestine laboratory.

4       a.   The Escondido laboratory site is a large warehouse space which, in the

5  portion of the warehouse by the front door, has been subdivided into several offices. Those

6  offices contain desks and computer equipment. ALBA uses those offices and computers to

7  run his Internet pornography web site; however, as set forth in my above-noted affidavits in

8  support of applications to intercept electronic communications, ALBA also uses those offices

9  and computers to further his organization's criminal activities. I believe that ALBA chose to

10  locate his internet "business" and his clandestine laboratory at the same site so that his

11  internet "business" would give an appearance of legitimacy to the Escondido laboratory site.

12       b.   The rear portion of the warehouse is accessible through a door located

13  near the end of the hallway adjacent to the above-noted offices. Once through that door, and

14  to the immediate left, there is a bookcase. The bookcase has disguised hinges and a hidden

15  latch. When the latch is released, the bookcase opens in the middle to allow access into the

16  clandestine laboratory.

17       c.   The clandestine laboratory is enclosed within a large sea/land container,

18  the inside of which has been completely insulated with black plastic material. The laboratory

19  has numerous electrical outlets and has been equipped with a ventilation system. The

20  equipment located inside the laboratory includes: round-bottom flasks, separatory funnels,

21  assorted scientific glassware, a rotating evaporator machine, two stainless steel reaction

22  vessels, thermometers, chemicals/solvents, vacuum pumps, scales and numerous

23  plastic/nalgene containers.

24      24.   The interception of wire/electronic communications, as well as the video

25  recording generated by the CCTV inside the Escondido laboratory site, have confirmed that

26  Alba Organization members are now actively engaged in manufacturing ecstasy at that

27

28

1    location. A sample of the recorded observations which substantiate that conclusion follows.[6]

2    　　　　a.　　On August 28, 2001, Walter FORRESTER, Mark FORRESTER, Karl

3    TAMEZ and Dennis ALBA were visually recorded working at the Escondido laboratory site.

4    At approximately 4:11 p.m., Walter FORRESTER carried a medium sized gas cylinder into the

5    laboratory.  At approximately 6:00 p.m., Mark FORRESTER, wearing heavy-duty plastic

6    gloves, poured an unidentified liquid into a container in the room outside the laboratory

7    entrance door.  At approximately 6:13 p.m., ALBA, Mark FORRESTER and Walter

8    FORRESTER carried a container into the laboratory. At 7:11 p.m., Mark FORRESTER carried

9    a solvent can into the laboratory. Based upon those individuals' activities throughout the day,

10   I believe they were engaged in a test cook.

11   　　　　b.　　On August 31, 2001, Dennis ALBA, Mark FORRESTER, Juan CHAVEZ,

12   and Israel HERNANDEZ were visually recorded working at the Escondido laboratory site. At

13   approximately 11:33 a.m., ALBA and CHAVEZ carried glass cooking pans out of the

14   laboratory. At approximately 2:30 p.m., Israel HERNANDEZ carried a large beaker out of the

15   laboratory. At approximately 2:38 p.m., Mark FORRESTER and CHAVEZ poured solvents into

16   various containers in the room outside the laboratory.  At approximately 2:53 p.m., CHAVEZ

17   carried a metal kettle into the laboratory.  Based upon those individuals' activities throughout

18   the day, I believe they were engaged in a test cook.

19   　　　　c.　　On September 1, 2001, Dennis ALBA and Derek GALANIS were visually

20   recorded working at the Escondido laboratory site. From 12:17 p.m. to 2:55 p.m. ALBA and

21   GALANIS walked in and out of the laboratory. During that time period, GALANIS occasionally

22   walked out of the laboratory to eat food and get something to drink in the room outside the

23   entrance to the laboratory.  Because we have been unable to install a CCTV camera inside

24   the laboratory, I am unsure exactly what ALBA and GALANIS were doing during the time

25   period described above.  However, given the layout of the clandestine laboratory and the

26

27   　　　[6]　　　As noted, I have only set forth below only a sample of the activity recorded within
     the Escondido laboratory site during the court-authorized CCTV interception. Indeed, during
28   almost every day of the CCTV interception we have recorded one or more of the Target
     Subjects engaged in conduct designed to further the Alba Organization's criminal activities.

1  length of time ALBA and GALANIS spent inside the laboratory, I believe that they were doing

2  something related to manufacturing ecstasy while inside that location (e.g., construction work,

3  monitoring a test cook or doing maintenance on the laboratory equipment).

4           d.     On September 7, 2001, Dennis ALBA, Mark FORRESTER, Juan CHAVEZ

5  and Israel HERNANDEZ were visually recorded working at the Escondido laboratory site.  At

6  approximately 1:55 p.m., ALBA walked out of the laboratory carrying a stainless steel reaction

7  vessel, which he placed on a work bench in the room outside the entrance to the laboratory.

8  At 2:36 p.m., ALBA and HERNANDEZ attached gauges to the reaction vessel.  At 6:10 p.m.,

9  ALBA and HERNANDEZ carried a large plastic trash can into the room outside the entrance

10  to the laboratory and placed plastic trash bags inside the can.  ALBA and CHAVEZ then began

11  mixing various chemicals inside the trash can.  While mixing those chemicals, both ALBA and

12  CHAVEZ were wearing heavy-duty plastic gloves; CHAVEZ was also wearing plastic eye

13  goggles.

14           e.     On September 17, 2001, Dennis ALBA, Derek GALANIS and Mark

15  FORRESTER were visually recorded working at the Escondido laboratory site.  At

16  approximately 2:22 p.m., ALBA walked into the laboratory.  At approximately 2:27 p.m.,

17  GALANIS walked into the laboratory.  Both ALBA and GALANIS walked out of the laboratory

18  at approximately 2:42 p.m.  At 5:16 p.m. Derek GALANIS carried three 1 gallon cans of

19  denatured alcohol into the room outside the entrance to the laboratory.  At approximately 6:56

20  p.m., ALBA and Mark FORRESTER, both wearing heavy-duty plastic gloves, walked out of the

21  laboratory.

22           f.     On September 21, 2001, at approximately 6:16 p.m., Mark FORRESTER

23  drove a white Ford F-150 pick-up into the warehouse area of the Escondido laboratory site.

24  Juan CHAVEZ and FORRESTER then unloaded boxes, an equipment cart and a man-sized

25  gas cylinder from the pick-up and placed them in the rear of the warehouse area.

26           g.     On September 22, 2001, Dennis ALBA, Mark FORRESTER, Juan

27  CHAVEZ and Israel HERNANDEZ were visually recorded working at the Escondido laboratory

28  site.  At various times from approximately 8:22 a.m. to 9:00 p.m., those individuals walked in

17

1   and out of the laboratory site. Based on their activities, I believe that the above-named

2   individuals were conducting a test ecstasy cook. For example, on three occasions, Mark

3   FORRESTER carried a round bottom reaction flask in and out of the laboratory. In addition,

4   at one point during the day, Israel HERNANDEZ walked out of the laboratory carrying a thirty

5   gallon nalgene container.

6           h.      On October 2, 2001, Dennis ALBA and Aaron LITTERAL were visually

7   recorded working at the Escondido laboratory site. From approximately 10:25 a.m. to 11:30

8   p.m., ALBA and LITTERAL walked in and out of the laboratory site. They were also recorded

9   mixing various chemicals inside large containers in the room outside the entrance door to the

10  laboratory. Based upon their activities, I believe that ALBA and LITTERAL were engaged in

11  a test ecstasy cook.

12          i.      On September 4, 2001, Dennis ALBA and Mark FORRESTER were

13  recorded  working at the Escondido laboratory site. From approximately 9:20 a.m. to 11:00

14  p.m., those individuals were seen carrying in and out of the laboratory site (or working on in

15  the room outside the laboratory site) items such as: a 5 gallon bucket, several pans containing

16  a white substance, a heating mantle, metal tubs with an attached electrical cord and a rotovap

17  machine.

18          j.      On September 7, 2001, Dennis ALBA, Mark FORRESTER, Juan CHAVEZ

19  and Israel HERNANDEZ were visually recorded working at the Escondido laboratory site. At

20  approximately 1:55 p.m., ALBA walked out of the laboratory carrying a stainless steel reaction

21  vessel, which he placed on a work bench in the room outside the entrance to the laboratory.

22  At 2:36 p.m., ALBA and HERNANDEZ attached gauges to the reaction vessel. At 6:10 p.m.,

23  ALBA and HERNANDEZ carried a large plastic trash can into the room outside the entrance

24  to the laboratory and placed plastic trash bags inside the can. ALBA and CHAVEZ then began

25  mixing various chemicals inside the trash can. While mixing those chemicals, both ALBA and

26  CHAVEZ were wearing heavy-duty plastic gloves; CHAVEZ was also wearing plastic eye

27  goggles.

28

k.    On September 17, 2001, Dennis ALBA, Derek GALANIS and Mark FORRESTER were visually recorded working at the Escondido laboratory site.    At approximately 2:22 p.m., ALBA walked into the laboratory.    At approximately 2:27 p.m., GALANIS walked into the laboratory.    Both ALBA and GALANIS walked out of the laboratory at approximately 2:42 p.m.    At 5:16 p.m. Derek GALANIS carried three 1 gallon cans of denatured alcohol into the room outside the entrance to the laboratory.    At approximately 6:56 p.m., ALBA and Mark FORRESTER, both wearing heavy-duty plastic gloves, walked out of the laboratory.

l.    On September 21, 2001, at approximately 6:16 p.m., Mark FORRESTER drove a white Ford F-150 pick-up into the warehouse area of the Escondido laboratory site. Juan CHAVEZ and FORRESTER then unloaded boxes, an equipment cart and a man-sized gas cylinder from the pick-up and placed them in the rear of the warehouse area.

m.    On September 22, 2001, Dennis ALBA, Mark FORRESTER, Juan CHAVEZ and Israel HERNANDEZ were visually recorded working at the Escondido laboratory site. At various times from approximately 8:22 a.m. to 9:00 p.m., those individuals walked in and out of the laboratory site.    Based on their activities, I believe that the above-named individuals were conducting a test ecstasy cook.    For example, on three occasions, Mark FORRESTER carried a round bottom reaction flask in and out of the laboratory.    In addition, at one point during the day, Israel HERNANDEZ walked out of the laboratory carrying a thirty gallon nalgene container.

## SUMMARY OF PROBABLE CAUSE FOR EACH INDIVIDUAL

25.    Dennis ALBA has been identified as the head of an organization responsible for manufacturing and distributing large quantities of ecstasy.    During this investigation, agents have learned that ALBA has secured financing for his organization, purchased chemicals used to manufacture ecstasy and has set up the clandestine laboratory in Escondido, California. Evidence developed during this investigation has also confirmed that ALBA has distributed ecstasy produced during test cooks through several different distributors.    A sample of the intercepted calls which substantiate my conclusions follows.

19

1              a.      On March 2, 2001, at approximately 11:20 a.m., Dennis ALBA, using

2  Target Telephone #1, placed a call to LILIUS in Sweden.  During the call, ALBA stated that

3  he needed to talk to LILIUS about some "sizing" questions.   ALBA then added that his

4  question was a "technical" one.   I believe that ALBA's reference to a "sizing" question

5  concerned the measurement of chemicals used during the ecstasy manufacturing process.

6  My opinion in this regard is substantiated in several ways.  First, the terminology used by

7  ALBA – "sizing" and "technical" – is consistent with my interpretation of this call.  Second, I

8  know that the relationship between ALBA and LILIUS is based solely upon their mutual interest

9  in manufacturing ecstasy.  Finally, the follow-up statements by ALBA confirm the illicit nature

10  of this call.  In particular, ALBA told LILIUS that he had utilized LILIUS' suggestion yesterday,

11  and that "it seemed to progress well" (the test "cook" of ecstasy seemed to go well).

12  Additionally, ALBA informed LILIUS that he needed to go to a pay telephone and call LILIUS

13  back to discuss his "technical" question.  Surveillance of ALBA following the above-noted call

14  confirmed that he and Walter FORRESTER used a pay phone to place a call to an unknown

15  number.   During the call, agents observed both ALBA and FORRESTER talking on the

16  telephone.  As noted above, FORRESTER traveled to Sweden in November, 2000, and met

17  with LILIUS. I believe that FORRESTER is the Alba Organization member who is responsible

18  for refining the process used to manufacture ecstasy.  I also believe that the individual called

19  by ALBA and FORRESTER from the pay telephone was LILIUS.

20              b.      On March 19, 2001, at approximately 11:03 a.m., Dennis ALBA placed

21  a call from Target Telephone #1 to Tomas LILIUS in Sweden.  During the call, LILIUS asked

22  ALBA if there had been any "good progress." ALBA replied that he had mastered the first half

23  of the ecstasy manufacturing process, but that he was still having problems completing the

24  cook.  ALBA told LILIUS that he had tried the "suggestion" (LILIUS' suggested method for

25  improving the ecstasy yield), but that "it stayed in its original format" (the suggestion did not

26  work).

27              c.      On April 4, 2001, at approximately 3:12 p.m., Dennis ALBA received an

28  incoming call on Target Telephone #1 from Laura ORTEGA.  During the call, ALBA told

1 ORTEGA that he "found a place with an Italian guy." ALBA further stated that "the place is
2 huge, but it needs a bit of work." ALBA then told ORTEGA that he did not have to sign a lease
3 and that "the guy" had told ALBA that he could stay as long as he paid the rent. At the end
4 of the conversation, ALBA stated that since he had found a new place, he could "get rid of all
5 his storage places." This call confirms that ALBA was responsible for renting the Escondido
6 laboratory site. My conclusion in this regard is substantiated by surveillance observations on
7 April 6, 2001. That day, surveillance agents observed Aaron LITTERAL, Israel HERNANDEZ
8 and Karl TAMEZ at a warehouse located at 1175 Industrial Avenue, Patton Industrial Park,
9 Suite R, Escondido, California. Those individuals were seen unloading suspected chemicals
10 and laboratory equipment at that location.

11       d.    On April 21, 2001, at approximately 8:34 p.m., Dennis ALBA placed a call
12 from Target Telephone #6 to Aaron LITTERAL. During the call, ALBA asked LITTERAL how
13 the test cook was proceeding. LITTERAL stated that he was going to allow the cooking
14 process to go "over the night." ALBA told LITTERAL that he had an idea "for the problem with
15 it when it ended" (difficulties during the last stage of the ecstasy cook) that he wanted to share
16 with LITTERAL.

17       e.    On May 14, 2001, at approximately 6:07 p.m., Dennis ALBA placed a call
18 from Target Telephone #1 to Mark FORRESTER on telephone number (530) 918-9484.
19 During the call, FORRESTER told ALBA that "his friend" (an unidentified investor) was
20 "bugging him [FORRESTER] about, you know . . . 'when are you gonna give me a little bit in
21 return'" (when will the investor receive a return on his investment in the ecstasy manufacturing
22 activities of the Target Subjects). ALBA replied that he couldn't possibly "push the people [the
23 workers in the Escondido laboratory] more that he already pushes them." FORRESTER
24 acknowledged that was true. ALBA then reminded FORRESTER that he had more money
25 invested in the operation than FORRESTER by stating, "don't forget, I'm out a hundred and
26 fifty [$150,000] over you." ALBA and FORRESTER then discussed the process of collecting
27 money from their associates. In that regard, ALBA remarked that "the flip side of his [ALBA's]
28 personality is the one that likes to beat on people until either the fucking blood comes or the

1  money." ALBA then stated, "you fucking hit people over the head until they fucking pay you,

2  it's as simple as that."

3          f.    On July 13, 2001, at approximately 7:55 p.m., Dean BOWEN placed a call

4  from Target Telephone #18 to Dennis ALBA on Target Telephone #10.  During the call,

5  BOWEN asked ALBA if he could get "a couple of them."  ALBA asked, "you mean the 'dos

6  equis' [in Spanish, literally "double x," but a term used by ALBA as a coded reference for

7  ecstasy]."  BOWEN replied, "yes."  ALBA stated that he would be able to sell the ecstasy to

8  BOWEN at a price of $4.25 per pill.  As confirmed by surveillance observations, the ecstasy

9  delivery took place in the parking lot of an electronics store located in Fountain Valley,

10  California on July 15, 2001.  During the transaction, someone inadvertently placed a call on

11  Target Telephone #1 to an unidentified female (UF).  The UF answered the call, so monitoring

12  agents could hear the background conversation between ALBA and BOWEN while Target

13  Telephone #1 was activated.  In particular, ALBA complained about problems his employees

14  had encountered making ecstasy and remarked that "unless you are a student of the science,

15  it just doesn't work . . . you end up getting into big trouble."  ALBA then stated that it should

16  be a "two day turn-around" (it should take two days to finish a single ecstasy cook).  BOWEN

17  then asked if ALBA had access to "GHB" (Gamma-hydroxy-butyrate, commonly known as the

18  "date rape drug").  ALBA replied, "I've got the formula, how to cook 'that' [GHB] . . . but I

19  haven't had a chance to read it yet."

20          g.    On July 17, 2001, at approximately 1:01 p.m., Dennis ALBA placed a call

21  from Target Telephone #10 to Tomas LILIUS in Sweden.  During the call, ALBA told LILIUS

22  that he would be able to wire transfer money to LILIUS via Western Union.  When ALBA asked

23  if LILIUS wanted the details of the wire transfer via "e-mail or over the phone," LILIUS told

24  ALBA to "put it in the new mailbox, 'the lip.'"  I believe that LILIUS' reference to "the lip"

25  concerned a website named "ZipLip," which is a site designed to facilitate the transmission of

26  "secure" (encrypted) messages. I also believe that the money being sent from ALBA to LILIUS

27  was for the purchase of chemicals used to manufacture ecstasy.

28

22

1           h.    On September 22, 2001, at approximately 6:33 p.m., Dennis ALBA placed

2    a call from Target Telephone #6 to Marco ESTRELLA-SOLANO on telephone number 011-52-

3    64-906765.  During the call, ESTRELLA stated, "those pills are pretty good, I mean, can we

4    talk?"  ALBA replied that ESTRELLA might get a chance to "check them out when he [ALBA]

5    goes down there [to Mexico]."  ESTRELLA cautioned ALBA that upon returning to United

6    States, law enforcement would run an "NCIC check" (a check in the National Crime

7    Information Center database) on him and ALBA "rap sheet would come up."  Based upon

8    information intercepted via the electronic intercept on ALBA's computers, I believe that

9    sometime prior to this call, ALBA provided ESTRELLA with 1,400 ecstasy tablets for $5,600.

10    The electronic intercept records also reveal that ESTRELLA paid ALBA $1,400 on September

11    8, 2001, and therefore still owed the Alba Organization $4,200 for the "fronted" ecstasy.

12        26.    Mark FORRESTER has been identified as Dennis ALBA's primary partner in the

13    manufacture and distribution of ecstasy.  FORRESTER has been intercepted engaging in

14    conversations related to the Alba Organization's illegal activities on hundreds of occasions

15    during this investigation.  A sample of the intercepted calls follows.

16        a.    On March 16, 2001, at approximately 2:46 p.m., Mark FORRESTER

17    placed a call from Target Telephone #3 to Target Telephone #2, which was answered by

18    Dennis ALBA.  During the call, ALBA explained to FORRESTER that Aaron LITTERAL was

19    in the process of dismantling the "work stations" (laboratory equipment).  FORRESTER then

20    asked ALBA to put LITTERAL on the phone, which ALBA did.  FORRESTER berated

21    LITTERAL for compromising the organization's prior laboratory site (believed to be 43255 E.

22    Benton Road, Hemet, California).  FORRESTER then told LITTERAL to "slow it down, it's

23    stirring too fast, I can hear it in the background."  LITTERAL did as instructed and decreased

24    the speed of the automatic stirring device.  FORRESTER then added that, "fast is not better,

25    sometimes it just creates vapor."  While listening to this telephone call, I could hear the sound

26    of a magnetic stir-bar hitting the inside of a glass container.  Later on in the call, FORRESTER

27    instructed LITTERAL to add more solvent to the solution.  While listening to this telephone call,

28    I could hear the solvent being poured into a container.

b.   On March 16, 2001, at approximately 4:26 p.m., Mark FORRESTER placed a call from Target Telephone #3 to Target Telephone #2, which was answered by Dennis ALBA. During the call, FORRESTER reiterated that ALBA needed to provide him with "conclusive evidence" regarding the ecstasy yield from the precursor chemicals. ALBA stated that the first test had "gone fine," and that he planned to do at least a second, and possibly a third, test as well. Agents believe that ALBA's reference to the "tests" concerned test cooks of ecstasy. ALBA further stated to FORRESTER, "test, test and retest – that's my motto." FORRESTER informed ALBA that he was focusing on "being a financier right now" and that he (FORRESTER) was still planning to meet with the "rich Iranians" that night. ALBA told FORRESTER to go ahead and "seal the deal" (obtain the necessary financing).

c.   On May 12, 2001, at approximately 10:55 a.m., Mark FORRESTER placed a call from Target Telephone #7 to Dennis ALBA on Target Telephone #10. During the call, ALBA told FORRESTER that he had talked to "Gamer" (LILIUS) about "a lot of things, equipment, accelerator boards. . . and why they fell short of expectations by about half." I believe that ALBA spoke to LILIUS about the results of a test ecstasy cook, which yielded about fifty percent less ecstasy than ALBA had hoped for. Toward the end of the call, ALBA stated that "he had found a way to convert 'that' into the 'oxy' [a reference to a chemical used to manufacture ecstasy]" and that they could "get that guy's new piece of equipment that he's going to build for them and run it right through and get like ninety percent, all day long." I believe that ALBA's reference to "getting ninety percent all day long" concerned the Target Subjects' ability to master the ecstasy manufacturing process so that they could achieve a ninety percent yield on every cook.

d.   On July 24, 2001, at approximately 7:13 p.m., Mark FORRESTER placed a call from Target Telephone #17 to Dennis ALBA on Target Telephone #6. During the call, ALBA and FORRESTER discussed the status of the ongoing ecstasy manufacturing process at the Escondido laboratory site. In particular, ALBA stated that "since they were going to invest money and more equipment [in constructing the laboratory]," they had to "see it from start to finish." ALBA then explained that he had been working on the ecstasy recipe and had

1  modified it so it was "simple and cheap."  Regarding the manufacturing process, ALBA

2  explained that Aaron LITTERAL had problems with "all the other nasty variables [chemical

3  equation variables]," but ALBA stated, "I've eliminated all that and made 'this' [the ecstasy

4  manufacturing process] so fucking easy, it's pathetic."  FORRESTER asked for clarification,

5  but then stated, "well, actually . . . I don't want to get into it too much on the phone."  ALBA

6  replied, "yeah, we don't need to."

7        e.       On August 1, 2001, at approximately 12:26 p.m., Mark FORRESTER

8  placed a call from Target Telephone # 15 to David WADA on an unknown telephone number.

9  During the call, WADA asked FORRESTER if "this" (Target Telephone #15) was a "good line

10  to talk on [a telephone not subject to law enforcement scrutiny]."  FORRESTER replied, "yes."

11  WADA then complained to FORRESTER that the weights of the ecstasy tablets were "way

12  off."  In particular, WADA stated that the weight per tablet had "started out at 226 [milligrams

13  per tablet] and went down to 190 [milligrams per tablet]."  WADA then stated that "one of them

14  didn't feel right so he threw it on the scale and it was like 195 [milligrams]."  FORRESTER then

15  asked if the rest were okay, to which WADA replied that he didn't know because "he did not

16  want to have to sit down and weigh every single 'one' [pill]."  WADA then stated that "it" (the

17  ecstasy delivery) was "like a couple hundred [pills] shy."  WADA asked FORRESTER whether

18  or not there was going to be a problem "doing like 10 [10,000 ecstasy tablets] a week."

19  FORRESTER stated that "those guys [at the Escondido laboratory site] just started a new

20  program" and that everyone would just have to wait and "see how it works."

21        f.       On October 1, 2001, at approximately 9:35 a.m., Mark FORRESTER

22  placed a call from Target Telephone #17 to David WADA on an unknown telephone number.

23  During the call, WADA asked if he should "overnight the papers" (send the proceeds from the

24  sale of ecstasy to FORRESTER via overnight mail).  FORRESTER replied, "no," and then

25  asked WADA if he needed to "re-up" (if WADA needed more ecstasy to sell).  WADA replied,

26  "no."

27        27.    Donald WALTERS has been identified as a financier of the Alba Organization's

28  ecstasy manufacturing operation.  Intercepted calls also confirm WALTERS' knowledge of and

1   participation in ALBA's ecstasy manufacturing activities. I have set forth a sample of those
2   calls below.

3          a.    On March 29, 2001, at approximately 1:02 p.m., Dennis ALBA placed a
4   call from Target Telephone #2 to Donald WALTERS at telephone number (818) 636-2671.
5   During the call, ALBA berated WALTERS for having accused him (ALBA) of "jumping"
6   WALTERS (cutting WALTERS out of the ecstasy operation). ALBA then made specific
7   references to "Tomas LILIUS, Carlos (Adams) and Martin (Gomez)" and the business they
8   were engaged in. Regarding that business, WALTERS complained that he kept giving ALBA
9   money, but that he never saw any return on his investment. ALBA replied that they had
10  experienced a "number of problems" and that they still did not have all the problems resolved.
11  In particular, ALBA stated that because they did not have a "base to work from" (a laboratory
12  site) things were "more difficult." ALBA then made reference to the ecstasy manufacturing
13  process, stating that "things aren't as easy as they are written down on paper or conveyed
14  verbally . . . it is a big difference when you are a 'desktop artist' and then you go into the
15  factory . . everything changes dramatically." I believe that when ALBA compared being a
16  "desktop artist" with moving to a "factory" he was referring to the difference between producing
17  small and large amounts of ecstasy. I am aware that it is difficult to make the transition from
18  a small laboratory "cook" to a large-scale manufacturing operation because a small error may
19  not significantly affect the yield in a small cook; however, that same small error, when
20  multiplied exponentially in connection with a large-scale cook, can have a considerably
21  adverse effect on the finished product.

22         b.    On March 30, 2001, at approximately 3:38 p.m., Donald WALTERS
23  placed a call from telephone number (818) 468-4187 to Dennis ALBA on Target Telephone
24  #2. During the call, ALBA told WALTERS about the status of a test ecstasy cook. Regarding
25  that cook, ALBA complained that "the illiterate Mexicans had ruined more stuff [ecstasy] today
26  than normal." WALTERS replied that when he picked them up for "work," he could speak their
27  language (WALTERS is fluent in Spanish). ALBA replied, "language is not the problem, the
28  guys are eager, but they don't know what they are doing."

1       c.      On June 11, 2001, at approximately 4:24 p.m., Dennis ALBA placed a call

2    from Target Telephone #6 to Donald WALTERS on telephone number (818) 486-4187.

3    During the call, ALBA told WALTERS that "some negative things had transpired in one area...

4    and in the other area there is a lack of coordinated interests and he is trying with "the other

5    two," the father and son [John and Derek GALANIS] and can't seem to get from A to B to C...

6    one of the things is that they are more familiar with raising capital for smoke and mirrors

7    operations."   ALBA then told WALTERS that they needed to get together to discuss the

8    problem in person. ALBA explained to WALTERS that "some of his (FORRESTER's) friends

9    over the past six months had gotten themselves into a little bit of hot water ... and he

10   (FORRESTER) should do everything with caution... but it's nothing urgent."  WALTERS

11   agreed and stated he was going to Las Vegas to see a "factory in storage" (possibly a non-

12   operational laboratory).  I believe that ALBA's references to "negative things" and people "in

13   hot water" indicated ALBA's concern about a recent probation search conducted of Philip

14   BENSON's residence in Huntington Beach, California.  BENSON is an associate of Mark

15   FORRESTER and intercepted calls indicate that FORRESTER recently approached BENSON

16   about becoming an ecstasy distributor for the Alba Organization.  I believe that ALBA's

17   reference to the "lack of coordinated interests" concerns ALBA's efforts to convince the

18   GALANIS family members to invest additional money in the Alba Organization's ecstasy

19   manufacturing operation

20       d.      On August 3, 2001, at approximately 10:37 a.m., Dennis ALBA placed a

21   call from Target Telephone #6 to Donald WALTERS on telephone number (818) 468-4187.

22   During the call, ALBA complained about having to carry three cellular telephones with him at

23   the same time.  WALTERS stated, "yeah, I know that feeling."  During the course of this

24   investigation, I have learned that ALBA, WALTERS and Mark FORRESTER use multiple

25   cellular telephones in order to avoid law enforcement scrutiny of their illegal activities. Later

26   during the call, ALBA and WALTERS agree to meet so they could discuss the "other project"

27   (the ecstasy laboratory).

28

27

1           e.      In addition to the intercepted calls, agents have discovered Western Union

2   records documenting the wire transfer of $3,885.00 from WALTERS to Tomas LILIUS.  I

3   believe those payments were made for ecstasy precursor chemical shipments brokered by

4   LILIUS.  More specifically, subpoenaed records revealed the following transfers:

5                           i.      Nov. 14, 2000 - $995.00 from Jack Harris to Tomas LILIUS

6                           ii.     Jan. 15, 2000  - $990.00 from Woodroe Wilson to Tomas LILIUS

7                           iii.    May 31, 2001  - $950.00 from Steven Fairchild to Tomas LILIUS

8                           iv.     June 6, 2001  -  $950.00 from Steven Fairchild to Tomas LILIUS.

9   Although I believe each of the records reflect a fictitious name for the sender, agents have

10  been able to associate each transfer with Donald WALTERS.   Regarding the November 14

11  and January 15, 2000, transfers, the sender provided telephone numbers (818) 326-6686 and

12  (818) 468-4187 respectively.  The subscriber of record  for both of those telephone numbers

13  is Walter Williams, a known alias for Donald WALTERS.  Additionally, agents have intercepted

14  calls wherein WALTERS was using telephone number  (818) 468-4187.  I also believe the

15  transfers on May 31 and June 6, 2001, both sent in the name of Steven Fairchild,  were sent

16  by Donald WALTERS.  Research of the address provided by the sender -- 6804 W. 14th

17  Place, Sioux Falls, South Dakota, revealed this address was utilized by Steven Luschen.  A

18  search of law enforcement databases revealed no identifiable records for an individual named

19  Steven Fairchild in Sioux Falls, North Dakota or the Sun Valley, California area.  However, an

20  individual named John Fairchild is a known associate of Donald WALTERS.  Thus, I believe

21  the name Steven Fairchild is a combination of Steven Luschen and John Fairchild, two known

22  associates of Donald WALTERS.  Additionally, all four transfers were made from Western

23  Union locations near WALTERS' residence in Tujunga, California.  Significantly, as long as

24  the amount of the wire transfer is less than $1,000, the sender does not have to produce

25  identification.

26          28.     Kenneth CUTLER has been identified as an ecstasy distributor working for the

27  Alba organization.  A sample of the calls which substantiate my belief in that regard are set

28  forth below.

a.    On May 23, 2001, at approximately 8:33 a.m., Dennis ALBA placed a call from Target Telephone #6 to Ken CUTLER. During the call, CUTLER confirmed that ALBA would deliver him "5" [most likely 5,000 ecstasy pills] on Friday.

b.    On May 24, 2001, at approximately 4:08 p.m., Dennis ALBA placed a call from Target Telephone #6 to Mark FORRESTER on a telephone not subject to court-authorized monitoring. During the call, ALBA told FORRESTER that if Ken CUTLER "got his end together" (came up with the money), he was going to deliver CUTLER "all the computer parts" (ecstasy).

c.    On May 24, 2001, at approximately 8:30 p.m., Dennis ALBA placed a call from Target Telephone #6 to Ken CUTLER. During the call, ALBA asked CUTLER if he "had the money for 'that' [the ecstasy]." CUTLER replied, "yes." ALBA then agreed to meet with CUTLER the next day.

d.    On May 25, 2001, at approximately 11:08 a.m., Dennis ALBA placed a call from Target Telephone #6 to Ken CUTLER. During the call, ALBA made arrangements to deliver ecstasy to CUTLER later that day. Regarding the transaction, CUTLER stated that "it would only take about 30 seconds to do it." ALBA then informed CUTLER that Craig FORRESTER needed the "other half of that, the '10' [$10,000] that he [CUTLER] is going to give him." CUTLER replied, "alright."

e.    On July 6, 2001, at approximately 6:21 p.m., Dennis ALBA placed a call from Target Telephone #1 to Kenneth CUTLER on telephone number (714) 350-6999. During the call, ALBA told CUTLER that he had "made an offer to two other 'friends' [unidentified ecstasy distributors]," but that CUTLER could "have it for about seventy-five cents less than the last time." I believe that ALBA was offering to sell CUTLER a quantity of ecstasy at a price per pill of seventy-five cents less than the price he charged CUTLER in connection with the 5,000 pill sale on May 25, 2001. ALBA told CUTLER that he would need to know if CUTLER "can do it [sell the ecstasy]" before Monday because that was the day ALBA "had to do something with a friend of his." Based upon other intercepted calls, I know that ALBA's

1  reference to "doing something with a friend of his" concerned ALBA's arrangement to pay

2  LILIUS for chemicals that LILIUS was in the process of obtaining for the Alba Organization.

3        f.    On September 26, 2001, law enforcement officers obtained a federal

4  search warrant in the Northern District of Illinois for a number of accounts used by ALBA

5  located at a business named "Freedrive.com." The execution of that warrant resulted in the

6  seizure of documents relating to the ecstasy manufacturing process, which had apparently

7  been sent from LILIUS to ALBA. In addition, we seized a several spread sheets indicating the

8  costs incurred by the Alba Organization in connection with its ecstasy manufacturing efforts.

9  The spread sheets also identify, in a coded fashion, various distributors working for the Alba

10  Organization. CUTLER is one of the distributors identified in those spread sheets (identified

11  as "KNC714") and he is documented as having received a total of 2,000 ecstasy tablets for

12  redistribution.

13     29.    Ted LeBLANC has been identified as an associate of the Alba Organization.

14  LeBLANC has used his business in Los Angeles, California Custom Shapes, to receive

15  chemical shipments for the Alba Organization. In addition, intercepted calls reveal that he is

16  aware of the identity of other Alba Organization members, which indicates to me that he is a

17  trusted member of the organization. A sample of the calls which substantiate my belief in that

18  regard are set forth below.

19        a.    On March 28, 2001, at approximately 10:53 a.m., Mark FORRESTER

20  placed a call from Target Telephone #4 to Ted LeBLANC at telephone number (714) 939-

21  9640. During the call, Mark FORRESTER told LeBLANC that he was "packing shit up and

22  moving it to the storage" (storing the laboratory equipment until a new site is found).

23  LeBLANC laughed and stated, "we're in between jobs." Mark FORRESTER told LeBLANC

24  that he was "trying to dial a number in Tecate of this guy who has that powder coating deal he

25  was talking to him [LeBLANC] about." I believe that FORRESTER's reference to the "powder

26  coating deal" concerned the ecstasy manufacturing process. I also believe that LeBLANC's

27  statement about being "in between jobs" related to the status of the Alba Organization's

28

1  ecstasy manufacturing operation – that the organization was in the process of making the

2  transition from conducting test cooks to establishing a large-scale laboratory.

3          b.    On April 20, 2001, at approximately 10:03 a.m., Mark FORRESTER

4  *placed a call from Target Telephone #4 to Dennis ALBA. During the call, FORRESTER* stated

5  that he had "another number" (another telephone facility) that he planned to "fire up" (activate)

6  when he returned from Mexico.   FORRESTER told ALBA that he should "do the same"

7  (change telephone facilities).  I believe that Forrester stated his intent to change telephone

8  facilities due to the surveillance which was detected on April 19, 2001.    Regarding that

9  surveillance, on April 19, 2001, intercepted calls revealed that Israel HERNANDEZ was going

10  to travel from the Escondido laboratory site to Ted LeBLANC's business in Los Angeles to pick

11  up chemicals.  The next day, surveillance agents followed HERNANDEZ as he drove from the

12  Escondido laboratory site towards LeBLANC's business; however, numerous calls intercepted

13  during the course of and following that surveillance revealed that HERNANDEZ became aware

14  that he was being followed by law enforcement officers.  In addition, law enforcement officers

15  conducting the court-authorized wiretaps in this case intercepted a call between Dennis ALBA

16  and  Mark  FORRESTER  wherein  they  discussed  law  enforcement's  surveillance  of

17  HERNANDEZ and the Government's ability to investigate crime by conducting wiretaps.

18          c.    On May 30, 2001, at approximately 1:55 p.m., Mark FORRESTER placed

19  *a call from Target Telephone #4 to Ted LeBLANC. During the conversation FORRESTER* told

20  LeBLANC that Aaron LITTERAL was planning on "turning himself in" (surrendering  to law

21  enforcement authorities) because he owed $7,000 in fines. FORRESTER stated that it would

22  probably be best if LITTERAL did turn himself in and "do the four months" (serve four months

23  in custody) because LITTERAL's girlfriend (Denise FRENCH) was out of control.  Based upon

24  other intercepted conversations, I know that FRENCH had prepared an "organizational chart"

25  detailing the criminal activities of the Alba Organization and that she had dropped the chart

26  *off at the Escondido laboratory site. I believe FRENCH did that to show ALBA that she knew*

27  what was going on and to blackmail ALBA into paying LITTERAL more money for participating

28  *in the Alba Organization's criminal activities. I also know that the LITTERAL's "pending case"*

31

was from March, 2000, when he was arrested for driving a vehicle under the influence of alcohol ("DUI"). While on probation for the DUI offense, LITTERAL was arrested in August, 2000, for possession of a controlled substance, a violation of LITTERAL's probationary conditions.

d.    On September 26, 2001, law enforcement officers obtained a federal search warrant in the Northern District of Illinois for a number of accounts used by ALBA located at a business named "Freedrive.com." The execution of that warrant resulted in the seizure of documents relating to the ecstasy manufacturing process, which had apparently been sent from LILIUS to ALBA. In addition, we seized a several spread sheets indicating the costs incurred by the Alba Organization in connection with its ecstasy manufacturing efforts. The spread sheets also identify, in a coded fashion, various distributors working for the Alba Organization. LeBLANC is one of the distributors identified in those spread sheets (identified as "LAF714") and he is documented as having received approximately 2,000 ecstasy tablets for redistribution.

30.    Tomas LILIUS' role in the Alba Organization is twofold. LILIUS has been supplying the Alba Organization with chemical recipes for manufacturing ecstasy and with the technical expertise for using those recipes. In addition, LILIUS has brokered several chemical shipments for the Alba Organization. An example of the intercepted calls which confirm LILIUS' role in the Alba Organization follows.

a.    On March 2, 2001, at approximately 11:20 a.m., Dennis ALBA, using Target Telephone #1, placed a call to LILIUS in Sweden. During the call, ALBA stated that he needed to talk to LILIUS about some "sizing" questions. ALBA then added that his question was a "technical" one. I believe that ALBA's reference to a "sizing" question concerned the measurement of chemicals used during the ecstasy manufacturing process. My opinion in this regard is substantiated in several ways. First, the terminology used by ALBA – "sizing" and "technical" – is consistent with my interpretation of this call. Second, I know that the relationship between ALBA and LILIUS is based solely upon their mutual interest in manufacturing ecstasy. Finally, the follow-up statements by ALBA confirm the illicit nature

32

1   of this call. In particular, ALBA told LILIUS that he had utilized LILIUS' suggestion yesterday,

2   and that "it seemed to progress well" (the test "cook" of ecstasy seemed to go well).

3   Additionally, ALBA informed LILIUS that he needed to go to a pay telephone and call LILIUS

4   back to discuss his "technical" question. Surveillance of ALBA following the above-noted call

5   confirmed that he and Walter FORRESTER used a pay phone to place a call to an unknown

6   number. During the call, agents observed both ALBA and FORRESTER talking on the

7   telephone. As noted above, FORRESTER traveled to Sweden in November, 2000, and met

8   with LILIUS. I believe that FORRESTER is the Alba Organization member who is responsible

9   for refining the process used to manufacture ecstasy. I also believe that the individual called

10  by ALBA and FORRESTER from the pay telephone was LILIUS.

11          b.      On March 19, 2001, at approximately 11:03 a.m., Dennis ALBA placed

12  a call from Target Telephone #1 to Tomas LILIUS in Sweden. During the call, LILIUS asked

13  ALBA if there had been any "good progress." ALBA replied that he had mastered the first half

14  of the ecstasy manufacturing process, but that he was still having problems completing the

15  cook. ALBA told LILIUS that he had tried the "suggestion" (LILIUS' suggested method for

16  improving the ecstasy yield), but that "it stayed in its original format" (the suggestion did not

17  work).

18          c.      On July 17, 2001, at approximately 1:01 p.m., Dennis ALBA placed a call

19  from Target Telephone #10 to Tomas LILIUS in Sweden. During the call, ALBA told LILIUS

20  that he would be able to wire transfer money to LILIUS via Western Union. When ALBA asked

21  if LILIUS wanted the details of the wire transfer via "e-mail or over the phone," LILIUS told

22  ALBA to "put it in the new mailbox, 'the lip.'" I believe that LILIUS' reference to "the lip"

23  concerned a website named "ZipLip," which is a site designed to facilitate the transmission of

24  "secure" (encrypted) messages. I also believe that the money being sent from ALBA to LILIUS

25  was for the purchase of chemicals used to manufacture ecstasy.

26          d.      On September 8, 2001, Dennis ALBA logged onto the website

27  "ZipLip.com" via the above-noted DSL account and entered the password

28  "dataexchange595527dx." While logged onto that website, ALBA composed and sent an

33

encrypted e-mail message to the address "dataexchange@ziplip.com.". Based upon the content of the e-mail, I believe it was sent to Tomas LILIUS in Sweden and concerned pending payments, chemical shipments and the possible construction/delivery of laboratory equipment. In particular, the e-mail contained the following information:

> To: dataexchange@ziplip.com
> Subject: Purchase Order
> Content: The Fed Ex data will be sent tomorrow so there's a possibility you will not receive it until Monday. . . If the attached purchase order requires modification, advise & I'll redo it . . .Funds will be transferred later in the week. . . For the current purchase this is what I have: Cost 60,000 / Paid 21,000  Paid 8500.00 of which 6500 was to cover the cost of blueprints/drawings for the piece of equipment we were going to purchase.  To date we paid 23,000 (plus the credited value of the amm formate providing the Pd/C [palladium on carbon] comes in under 3,000). . .Roto-evaporators: the company you do business with, do they have a website? Next the process to convert start into ketone & then hydro w/ ammonia best done over the phone or e-mail?  Do [not] forget to produce 1 kg of phenyl 2 nitro pp so it can be used in a sample run.  If all could ship at one time, that would simplify the entire process . . . Talk with you soon . . . Best BM.

31. <u>Jason GALANIS</u> has been identified as a member of the Alba Organization; however, his role within the organization remains unclear.

a. Purchase records I have reviewed confirm that in May, 1997, Jason GALANIS bought the following items: support stands (2); thermometers (2); an adapter; connectors (3); grease; a flask; a beaker; clamps (3); a condenser; a cylinder; a heating mantle; a reaction flask; and PH strips. Additional purchase records reveal that in July, 1997, Jason GALANIS purchased an adapter, a condenser, a column and an adapter. Although the purchase of that laboratory equipment predates this investigation by several years, I nevertheless believe those purchases to be significant. First, the acquisition of the above-noted type and quantity of laboratory equipment indicates that Jason GALANIS was involved in establishing a clandestine laboratory.[7]  GALANIS' willingness to involve himself in manufacturing controlled substances in the past is consistent with my conclusion that he is

---

[7]     Agents have done a thorough check for all businesses Jason GALANIS has been involved in. Although that check revealed a connection between GALANIS and a number of different businesses, none of those businesses were involved in activities requiring the purchase of the above-noted laboratory equipment. Thus, I believe those items were purchased for an illegal purpose, as opposed to a legitimate purpose.

1  currently an active member of the Alba Organization.  Second, some of the laboratory

2  equipment I have observed inside the Escondido laboratory is consistent with the type of

3  equipment purchased by GALANIS. Although it is impossible for me to determine whether the

4  equipment is the same, I do know that the laboratory equipment purchased by GALANIS can

5  be used for a number of years.  Thus, it is possible that some of the equipment being used in

6  the Escondido laboratory site was purchased by Jason GALANIS.

7          b.      On March 4, 2001, at approximately 1:49 p.m., ALBA received an

8  incoming call on Target Telephone #1 from Jason GALANIS. During the call, ALBA stated that

9  he would be meeting with some people this week and that he would tell GALANIS those

10 peoples' names when they had an opportunity to speak in person.[8/] ALBA further stated that

11 had talked to "someone else," but that the "location would have to stand . . . because they

12 can't have a branch south of the border."  ALBA then assured GALANIS that the people he

13 would be meeting with were well-established and that they had the ability to "put money into

14 it" because they were "related to other groups that produce enormous amounts of money."

15 ALBA then stated that they "should be operational in the near future."  I believe that this

16 conversation concerned the status of the Alba Organization's activities.  As set forth above,

17 and as noted during this call, ALBA abandoned his plans to manufacture ecstasy at the site

18 in Tecate, Mexico, and decided to use the manufacturing location in Hemet, California (which

19 was later abandoned when LITTERAL brought his girlfriend to that location).   This

20 conversation also confirms ALBA's role in arranging financing for a large ecstasy "cook."

21 Most significantly, this call leads me to believe that GALANIS is an active participant in the

22 Alba Organization's criminal activities.  Indeed, given ALBA's extraordinarily cautious nature

23 _____

24      [8/]     Based upon other intercepted calls, I believe that the people ALBA were referring to Mexican drug organization kingpin Joaquin Guzman-Loera and his associates. In particular,

25 during an intercepted call between Mark FORRESTER and ALBA on May 6, 2001, ALBA stated that "the old man" (WALTERS) must have been put on the "hot list" because he had

26 just visited the guy added to the FBI's 10 Most Wanted List (Joaquin Guzman-Loera). ALBA speculated that WALTERS must have been filmed during his visit with Guzman because "they

27 have cameras and tapes throughout that whole place." ALBA then stated that he would "pass that on to the 'old man' just so he knows." Later that day, agents intercepted a call between

28 ALBA and WALTERS wherein ALBA informed WALTERS about Guzman-Loera's addition to the 10 Most Wanted List.  ALBA and WALTERS then discussed how thorough the Government can be when it investigates someone notorious.

1  and his continued vigilance regarding the detection of his illegal activities, I do not believe that

2  he would gratuitously disclose the current status of his illegal activities to someone who was

3  not also involved in those illegal activities.

4    32.    Derek GALANIS has been identified as a financier and facilitator for the Alba

5  Organization.  A sample of Derek GALANIS' criminal activity and intercepted calls follow.

6        a.    GALANIS has assisted the Alba Organization in securing funding for their

7  ecstasy manufacturing efforts.  I base this belief on intercepted calls such as the following.

8  On September 3, 2001, Dennis ALBA placed a call on Target Telephone #11 to Derek

9  GALANIS on telephone number (858) 509-9533.  During that call, GALANIS said, "there's

10  good news, I'm going back east Wednesday and it looks like we're going to have funds for

11  both things."  I believe GALANIS' reference to "both things" concerns both the ecstasy

12  manufacturing enterprise and ALBA's Internet pornography website endeavor. During the

13  course of this investigation I have found no evidence of other "joint ventures" in which

14  GALANIS and ALBA are currently involved.

15        b.    In addition to his involvement in securing financing, GALANIS has

16  assisted in the transportation and storage of precursor chemicals.  For example, on November

17  28, 2000, agents conducting surveillance at Infobase in Carlsbad, California, observed

18  GALANIS and ALBA load two containers of Raney Nickel (a precursor chemical used in the

19  ecstasy manufacturing process) into a Mercedes driven by Derek GALANIS.  GALANIS and

20  ALBA later  transported the chemicals to Allspace Storage where they were unloaded.

21        c.    GALANIS has also been involved in the manufacturing process at the

22  Escondido Laboratory site.  Agents monitoring the court authorized CCTV inside the

23  Escondido Laboratory site have observed GALANIS on several occasions assisting ALBA

24  inside that facility.  For example, on September 17, 2001, GALANIS was observed entering

25  the laboratory site through the disguised doorway carrying what appeared to be 3 one-gallon

26  sized solvent containers.

27    33.    Walter FORRESTER has been identified as an associate of the Alba

28  Organization. FORRESTER is the owner of the Hemet property, where the Alba Organization

1   planned to locate its clandestine laboratory until that site was compromised by LITTERAL. As

2   set forth above, FORRESTER has been recorded via the CCTV intercept working at the

3   Escondido laboratory site on a regular basis. A sample of the intercepted calls involving

4   Walter FORRESTER are set forth below.

5                a.      On March 2, 2001, at approximately 11:20 a.m., Dennis ALBA, using

6   Target Telephone #1, placed a call to LILIUS in Sweden. During the call, ALBA stated that

7   he needed to talk to LILIUS about some "sizing" questions. ALBA then added that his

8   question was a "technical" one. I believe that ALBA's reference to a "sizing" question

9   concerned the measurement of chemicals used during the ecstasy manufacturing process.

10  My opinion in this regard is substantiated in several ways. First, the terminology used by

11  ALBA – "sizing" and "technical" – is consistent with my interpretation of this call. Second, I

12  know that the relationship between ALBA and LILIUS is based solely upon their mutual interest

13  in manufacturing ecstasy. Finally, the follow-up statements by ALBA confirm the illicit nature

14  of this call. In particular, ALBA told LILIUS that he had utilized LILIUS' suggestion yesterday,

15  and that "it seemed to progress well" (the test "cook" of ecstasy seemed to go well).

16  Additionally, ALBA informed LILIUS that he needed to go to a pay telephone and call LILIUS

17  back to discuss his "technical" question. Surveillance of ALBA following the above-noted call

18  confirmed that he and Walter FORRESTER used a pay phone to place a call to an unknown

19  number. During the call, agents observed both ALBA and FORRESTER talking on the

20  telephone. As noted above, FORRESTER traveled to Sweden in November, 2000, and met

21  with LILIUS. I believe that FORRESTER is the Alba Organization member who is responsible

22  for refining the process used to manufacture ecstasy. I also believe that the individual called

23  by ALBA and FORRESTER from the pay telephone was LILIUS.

24               b.      On May 12, 2001, at approximately 8:33 p.m., Walter FORRESTER

25  placed a call from Target Telephone #5 to Karl TAMEZ on telephone number (714) 534-3197.

26  During the call, FORRESTER told TAMEZ that "they shut 'that thing' [the laboratory]

27  completely down" because they were going to "go through it piece by piece . . . [and

28  determine] what they need to make it work and it's going to stay there, remain there, that's why

37

1    it's there, for one reason." TAMEZ replied that, "assembly lines all have certain machines."

2    Later in the call, FORRESTER noted that Aaron LITTERAL only "got just around 50%" [a 50%

3    yield during an ecstasy cook]. With that low a yield, FORRESTER remarked that, "it's going

4    to cost more to make it than you're going to sell it for." TAMEZ agreed. FORRESTER then

5    assured TAMEZ that "they'll get the 'thing' [laboratory] set up, work the right way" and they he

6    and TAMEZ would "sit down and go through it step by step – water being added here, water

7    being drained out here – and that way whatever is there stays there and is equipped for that."

8    TAMEZ replied, "everything should be permanent, like an assembly line, nothing moves but

9    the mind."

10          c.     On August 11, 2001, at approximately 10:52 a.m., Walter FORRESTER

11    placed a call from an unidentified telephone to Dennis ALBA on Target Telephone #11.

12    During the call, ALBA demanded to know where FORRESTER was, to which FORRESTER

13    angrily replied that he had gone back to his house. FORRESTER and ALBA then began

14    yelling at one another, blaming each other for the delay in production of ecstasy. ALBA stated

15    that if they were not done by Wednesday, "he would be gone" (an unidentified third party,

16    possibly a financier for the Alba Organization, would no longer back the organization's ecstasy

17    manufacturing efforts). Toward the end of the call, ALBA reminded FORRESTER that he

18    (ALBA) was in a "big, deeper hole" than FORRESTER, because he had already invested

19    $250,000 in the ecstasy manufacturing effort.

20          d.     Information obtained via the electronic interception has revealed the

21    Walter FORRESTER has been paid over $20,000 for his involvement in the Alba

22    Organization's ecstasy manufacturing efforts.

23      34.    Karl TAMEZ is employed by the Alba Organization as an ecstasy cook and

24    laborer. As set forth above in paragraph 24, TAMEZ has been recorded via the CCTV

25    intercept working at the Escondido laboratory site on a regular basis. TAMEZ has also been

26    intercepted discussing his illegal activities. A sample of those intercepted calls follows.

27          a.     On May 12, 2001, at approximately 8:33 p.m., Craig FORRESTER placed

28    a call from Target Telephone #5 to Karl TAMEZ on telephone number (714) 534-3197. During

the call, FORRESTER told TAMEZ that "they shut 'that thing' [the laboratory] completely down" because they were going to "go through it piece by piece . . . [and determine] what they need to make it work and it's going to stay there, remain there, that's why it's there, for one reason." TAMEZ replied that, "assembly lines all have certain machines."   Later in the call, FORRESTER noted that Aaron LITTERAL only "got just around 50%" [a 50% yield during an ecstasy cook].  With that low a yield, FORRESTER remarked that, "it's going to cost more to make it than you're going to sell it for."  TAMEZ agreed.  FORRESTER then assured TAMEZ that "they'll get the 'thing' [laboratory] set up, work the right way" and they he and TAMEZ would "sit down and go through it step by step – water being added here, water being drained out here – and that way whatever is there stays there and is equipped for that."  TAMEZ replied, "everything should be permanent, like an assembly line, nothing moves but the mind."

b.      On August 11, 2001, at approximately 11:31 a.m., Karl TAMEZ placed a call from Target Telephone #1 to Dennis ALBA on a telephone not subject to interception. During the call, ALBA told TAMEZ that he had just received an e-mail from unidentified Alba Organization financiers who were "tired of waiting" for a return on their investment.  Regarding that e-mail, ALBA told TAMEZ that he was going to "post it" (inside the Escondido laboratory site) so that everyone could see it.

c.      Information obtained via the electronic interception has revealed the TAMEZ has been paid over $8,000 for his involvement in the Alba Organization's ecstasy manufacturing efforts.

35.      Dean BOWEN has been identified as an ecstasy distributor working for the Alba organization.  A sample of the calls which substantiate my belief in that regard are set forth below.

a.      On July 5, 2001, at approximately 10:03 a.m., Dennis ALBA placed a call from Target Telephone #10 to Mark FORRESTER on telephone number (760) 799-6469. During the call, ALBA told FORRESTER that he was going to go to L.A. to see "that kid" (Dean BOWEN) and see if "he [BOWEN] can come up with 'forty-three' or 'forty-four' cash for ten [cash to purchase 10,000 ecstasy pills at a price of $4.30 or $4.40 per pill]."  ALBA told

1  FORRESTER that he needed the money for a "deposit." Regarding the "deposit," based upon

2  other intercepted conversations, I know that ALBA needed to acquire $20,000 to send to

3  LILIUS for a pending chemical shipment. During the call ALBA acknowledged that it would

4  take "three days with Western Union to get it to 'him' [wire transfer the $20,000 to LILIUS in

5  Europe]."

6          b.      Based upon a number of intercepted calls beginning on July 13, 2001,

7  agents believed that Dennis ALBA had made arrangements to sell Dean BOWEN a unknown

8  quantity of ecstasy at a price of $4.25 per pill. As confirmed by surveillance observations, the

9  ecstasy delivery took place in the parking lot of an electronics store located in Fountain Valley,

10  California on July 15, 2001. During the transaction, ALBA inadvertently placed a call on Target

11  Telephone #1 to an unidentified female (UF). The UF answered the call, so monitoring agents

12  could hear the background conversation between ALBA and BOWEN while Target Telephone

13  #1 was activated. In particular, ALBA complained about problems his employees had

14  encountered making ecstasy and remarked that "unless you are a student of the science, it

15  just doesn't work . . . you end up getting into big trouble." ALBA then stated that it should be

16  a "two day turn-around" (it should take two days to finish a single ecstasy cook). BOWEN then

17  asked if ALBA had access to "GHB" (Gamma-hydroxy-butyrate, commonly known as the "date

18  rape drug"). ALBA replied, "I've got the formula, how to cook 'that' [GHB] . . . but I haven't had

19  a chance to read it yet."

20          c.      On August 26, 2001, at approximately 12:34 p.m., Target Telephone #1

21  received a call from Target Telephone #18. Based on the content of the intercepted call, I

22  believe that someone inadvertently activated Target Telephone #18, causing it to call Target

23  Telephone #1. The intercepted call contains portions of an overheard conversation between

24  ALBA and BOWEN. During the conversation, ALBA told BOWEN about the pending shipment

25  of "nitropropene" (3,4 propene, a precursor chemical used to manufacture ecstasy), which

26  ALBA stated would be delivered sometime in September. After describing the shipping

27  process for the 3,4 propene, ALBA told BOWEN that he was not concerned about law

28  enforcement detection of the shipment because he had been checking "the DEA's [Internet

1  web] site regularly . . . [and] other sites which deal with the Government's chemical

2  intervention program."  Based upon the information he obtained from "the other sites," ALBA

3  stated that he knew "what to stay away from in order not to attract attention from anybody.

4          d.    On September 9, 2001, at approximately 2:13 p.m., Brian CHAPMAN

5  placed a call from an unknown telephone number to Dean BOWEN on Target Telephone #18.

6  During the call, BOWEN arranged to send CHAPMAN a sample of ecstasy hidden inside a

7  computer diskette via overnight mail.

8          e.    On September 17, 2001, at approximately 5:56 p.m., Dean BOWEN

9  placed a call from Target Telephone #18 to Dennis ALBA on Target Telephone #6.  During

10  the call, BOWEN made arrangements to meet with ALBA on "Wednesday or Thursday."

11  ALBA stated that during the meeting, he and BOWEN could "discuss the site" (discuss the

12  status of the Escondido laboratory site).  ALBA also stated that he would hand BOWEN "the

13  what-do-you-call-it [ecstasy] to him" and that he already had the "stuff" (ecstasy) that he would

14  bring to show BOWEN.

15          f.    On September 20, 2001, at approximately 4:23 p.m., Dean BOWEN

16  placed a call from Target Telephone #18 to Brian CHAPMAN on a telephone not subject to

17  interception.  During the call, BOWEN and CHAPMAN discussed the ecstasy sample that

18  BOWEN had mailed to CHAPMAN.  Regarding that sample, CHAPMAN stated that he had

19  "given it to him, and then you know, they're getting together" (CHAPMAN  had delivered the

20  ecstasy sample to unidentified users and/or distributors).  BOWEN replied, "so maybe we'll

21  know in the next day or so?" CHAPMAN responded that "he" (the ecstasy recipient) appeared

22  anxious, so CHAPMAN stated that he should "know something tomorrow . . . unless he found

23  some other 'service' [source of supply], you know."  CHAPMAN then assured BOWEN that he

24  told the prospective buyer that once he was paid the money, "it'll take a couple days [to obtain

25  the ecstasy]."  BOWEN replied, "good."

26          g.    On October 5, 2001, at approximately 9:03 p.m., Dean BOWEN placed

27  a call from Target Telephone #18 to Brian CHAPMAN on an unknown telephone number.

28  During the call, CHAPMAN told BOWEN that the "other people [unidentified customers] aid

that the product [ecstasy] is fine." CHAPMAN then asked BOWEN if "they could be made with little faces on it [if the ecstasy pills could have faces imprinted on them]." BOWEN replied, "no." BOWEN then told CHAPMAN that "one of the items [CHAPMAN] had inquired about is available." CHAPMAN asked if "it starts with an 'H' [heroin]." BOWEN replied, "no, it starts with a 'C' [cocaine]."

36.    David WADA has been identified as a financier and ecstasy distributor for the Alba Organization.    Intercepted electronic communications reveal that during the course of this investigation, WADA has received at least 10,000 ecstasy pills from the Alba Organization. A sample of WADA's documented criminal activity and intercepted calls follows.

a.    On August 1, 2001, at approximately 12:26 p.m., Mark FORRESTER placed a call from Target Telephone # 15 to David WADA on an unknown telephone number. During the call, WADA asked FORRESTER if "this" (Target Telephone #15) was a "good line to talk on [a telephone not subject to law enforcement scrutiny]." FORRESTER replied, "yes." WADA then complained to FORRESTER that the weights of the ecstasy tablets were "way off." In particular, WADA stated that the weight per tablet had "started out at 226 [milligrams per tablet] and went down to 190 [milligrams per tablet]." WADA then stated that "one of them didn't feel right so he threw it on the scale and it was like 195 [milligrams]." FORRESTER then asked if the rest were okay, to which WADA replied that he didn't know because "he did not want to have to sit down and weigh every single 'one' [pill]." WADA then stated that "it" (the ecstasy delivery) was "like a couple hundred [pills] shy." WADA asked FORRESTER whether or not there was going to be a problem "doing like 10 [10,000 ecstasy tablets] a week." FORRESTER stated that "those guys [at the Escondido laboratory site] just started a new program" and that everyone would just have to wait and "see how it works."

b.    On August 16, 2001, at approximately 11:31 a.m., Mark FORRESTER placed a call from Target Telephone #15 to David WADA on an unidentified telephone number. During the call, FORRESTER stated that he had WADA "at the top of his Christmas list" (WADA would receive the next quantity of ecstasy produced by FORRESTER and other Alba Organization members at the Escondido laboratory site). FORRESTER also told WADA

42

1  that "they [an unidentified third party] decided to extend their 'stay' [deadline imposed on the

2  Alba Organization for the production of ecstasy] for a while, which is great."

3          c.      On September 5, 2001, Mark FORRESTER traveled to Salinas, California

4  to meet David WADA, this meeting was observed by surveillance agents.  Based upon later

5  intercepted telephone conversations and intercepted electronic communications, I believe that

6  FORRESTER sold WADA 10,000 ecstasy tablets during the meeting in Salinas.  In exchange

7  for that ecstasy, WADA made a partial payment of $16,000 to FORRESTER.  My conclusion

8  in that regard is substantiated by an electronic interception on September 7, 2001, wherein

9  ALBA input the following data on a spreadsheet page titled "in-out":

10                OAKLD

11        4.25   10000  42500

12        4.25           -16000       PD09.06

13                        26500        Bal-Due.

14  I believe that ALBA gave WADA the moniker OAKLD because he lives in the Oakland area,

15  and that the above notations reflect that on September 6, 2001, WADA paid $16,000 as a

16  partial payment for 10,000 ecstasy pills, which were provided to WADA at a price of $4.25 per

17  tablet.

18          d.      On October 1, 2001, at approximately 9:35 a.m., Mark FORRESTER

19  placed a call from Target Telephone #17 to David WADA on an unknown telephone number.

20  During the call, WADA asked if he should "overnight the papers" (send the proceeds from the

21  sale of ecstasy to FORRESTER via overnight mail).  FORRESTER replied, "no," and then

22  asked WADA if he needed to "re-up" (if WADA needed more ecstasy to sell).  WADA replied,

23  "no."

24      37.    Laura ORTEGA has knowingly assisted the Alba Organization's criminal activities

25  on several occasions.  For example, in connection with the delivery of ecstasy precursor

26  chemicals brokered by LILIUS, ORTEGA sent a $3,000 payment from Carlsbad, California,

27  to LILIUS in Sweden via Western Union.  In addition, ORTEGA picked up laboratory

28  equipment for the Escondido lab site from a business named McMaster-Carr in Santa Fe

Springs, California. When she sent the money to LILIUS and picked up the laboratory equipment I believe that ORTEGA did so knowing that she was furthering the Alba Organization's criminal activities. My conclusion in that regard is substantiated by intercepted telephone calls wherein ORTEGA demonstrates knowledge of the Alba Organization's illegal activities:

a.      On March 2, 2001, at approximately 9:18 p.m., Dennis ALBA, using Target Telephone #1, placed a call to Laura ORTEGA. During the call, ALBA stated that he had to buy some "plumbing stuff" (laboratory equipment) because they had a pipe burst earlier in the day. ALBA further stated that he had spilled caustic soda on himself and that his sweat shirt would have to go in the wash. I know that caustic soda is a chemical used to manufacture methamphetamine and that it has a very strong chemical odor. The only "legitimate" business that ALBA is involved in an Internet pornography business. Thus, ALBA's willingness to discuss his purchase of "plumbing stuff" with ORTEGA and his reference to spilling caustic soda on himself leads me to believe that ORTEGA is aware of ALBA's illegal activities.

b.      On July 13, 2001, at approximately 3:16 p.m., Dennis ALBA received a call on Target Telephone #1 from Laura ORTEGA, who placed the call from telephone number (619) 757-9250. During the call, ORTEGA asked ALBA to call Pacific Bell and get them [Pacific Bell] to put the "number thing on" (caller identification) so that people who call will have to have their number unblocked. ALBA then asked ORTEGA to hold for a second, at which point ALBA can be heard talking to Derek GALANIS in the background. In particular, ALBA asked GALANIS why he needed the "General" (believed to be a General in the Kosovo Liberation Army). GALANIS responded that he needed the General so he could "smuggle his own drugs." ALBA replied, "ah." ALBA then resumed his conversation with ORTEGA.

38.      Juan CHAVEZ is employed by the Alba Organization as an ecstasy cook and laborer. As set forth above in paragraph 24, CHAVEZ has been recorded via the CCTV intercept working at the Escondido laboratory site on a regular basis. CHAVEZ has also been intercepted discussing his illegal activities. For example, on August 20, 2001, at approximately

44

1   4:19 p.m., Juan CHAVEZ placed a call from Target Telephone #11 to Miguel CHAVEZ on

2   telephone number (909) 943-9996.  During the call, Juan informed Miguel that all he needed

3   to do was to "make them into pills [press the ecstasy into pills for distribution]."  Juan further

4   stated that he and the other workers at the Escondido laboratory site would be "finishing [a test

5   cook] a week from Thursday."  CHAVEZ has also sent money transfers to Tomas LILIUS to

6   pay for chemical shipments brokered by LILIUS.  The three $5,000 money transfers were all

7   sent on July 9, 2001, via Western Union.  Because CHAVEZ sent each of those transfers

8   from a different location, I believe that he knew the money being sent represented the partial

9   payment for chemicals shipped to the Alba Organization.

10          39.    Aaron LITTERAL is employed by the Alba Organization as an ecstasy cook and

11  laborer.  As set forth above in paragraph 24, LITTERAL has been recorded via the CCTV

12  intercept working at the Escondido laboratory site on a regular basis.  LITTERAL has also

13  been intercepted discussing his illegal activities.  A sample of those intercepted calls follows.

14          a.    On March 16, 2001, at approximately 2:46 p.m., Mark FORRESTER

15  placed a call from Target Telephone #3 to Target Telephone #2, which was answered by

16  Dennis ALBA.  During the call, ALBA explained to FORRESTER that Aaron LITTERAL was

17  in the process of dismantling the "work stations" (laboratory equipment).  FORRESTER then

18  asked ALBA to put LITTERAL on the phone, which ALBA did.  FORRESTER berated

19  LITTERAL for compromising the organization's prior laboratory site (believed to be 43255 E.

20  Benton Road, Hemet, California, the location of Target Telephone #5).  FORRESTER then

21  told LITTERAL to "slow it down, it's stirring too fast, I can hear it in the background."

22  LITTERAL did as instructed and decreased the speed of the automatic stirring device.

23  FORRESTER then added that, "fast is not better, sometimes it just creates vapor."  While

24  listening to this telephone call, I could hear the sound of a magnetic stir-bar hitting the inside

25  of a glass container.  Later on in the call, FORRESTER instructed LITTERAL to add more

26  solvent to the solution.  While listening to this telephone call, I could hear the solvent being

27  poured into a container.

28

45

b.      On April 21, 2001, at approximately 8:34 p.m., Dennis ALBA placed a call from Target Telephone #6 to Aaron LITTERAL. During the call, ALBA asked LITTERAL how the test cook was proceeding. LITTERAL stated that he was going to allow the cooking process to go "over the night." ALBA told LITTERAL that he had an idea "for the problem with it when it ended" (difficulties during the last stage of the ecstasy cook) that he wanted to share with LITTERAL.

c.      On April 22, 2001, at approximately 9:24 a.m., Dennis ALBA placed a call from Target Telephone #6 to Aaron LITTERAL. During the call, ALBA asked LITTERAL if he "froze that stuff," to which LITTERAL replied, "yes." ALBA then asked LITTERAL if the "the stuff looked o.k." LITTERAL replied that "it looked fantastic." I believe that ALBA and LITTERAL were discussing a test batch of ecstasy, which LITTERAL had placed in the freezer following the cook. Later in the conversation, ALBA told LITTERAL that he would talk to his "friend over there" (LILIUS in Sweden) about "various and assorted techniques, so they (the test cooks) can have some better guidance." I believe that ALBA was telling LITTERAL that he would consult with LILIUS to see if he could offer any suggestions ("better guidance") regarding the ecstasy manufacturing process.

d.      On July 24, 2001, at approximately 7:13 p.m., Mark FORRESTER placed a call from Target Telephone #17 to Dennis ALBA on Target Telephone #6. During the call, ALBA and FORRESTER discussed the status of the ongoing ecstasy manufacturing process at the Escondido laboratory site. In particular, ALBA stated that "since they were going to invest money and more equipment [in constructing the laboratory]," they had to "see it from start to finish." ALBA then explained that he had been working on the ecstasy recipe and had modified it so it was "simple and cheap." Regarding the manufacturing process, ALBA explained that Aaron LITTERAL had problems with "all the other nasty variables [chemical equation variables]," but ALBA stated, "I've eliminated all that and made 'this' [the ecstasy manufacturing process] so fucking easy, it's pathetic." FORRESTER asked for clarification, but then stated, "well, actually . . . I don't want to get into it too much on the phone." ALBA replied, "yeah, we don't need to.

40.     Rafael HERNANDEZ has been identified as an associate of the Alba Organization. A sample of the intercepted calls which demonstrate his participation in the Alba Organization's illegal activities follows.

a.     On August 22, 2001, at approximately 2:29 p.m., Israel HERNANDEZ place a call from Target Telephone #6 to Rafael HERNANDEZ on Target Telephone #13. During the call, Israel complained that ALBA was going to deduct weekly expenses from his (Israel's) pay and that he would therefore only make about "ten thousand [$10,000] with all the risks and everything." Regarding the "risks and everything," Israel stated that if caught, he was looking at "fifteen years for you-know-what." Rafael agreed that Israel would, at a minimum, get "fifteen." Israel replied, "it's a lot of time to be in the cage." Israel then told Rafael that ALBA had been worried that one of the chemical barrels might have "had a trace" (law enforcement may be tracking the barrel's movement with the delivery company).

b.     On August 23, 2001, at approximately 3:20 p.m., Ricardo HERNANDEZ placed a call from telephone number (619) 886-4666 to Rafael HERNANDEZ on Target Telephone #13. During the call, Ricardo told Rafael that Israel HERNANDEZ had already gone to "put the stamps on them" (press the ecstasy into pills). Ricardo then stated that the "whole thing might be ready this week" (the ecstasy may be ready for distribution this week).

c.     On April 17, 2001, at approximately 4:31 p.m., Israel HERNANDEZ placed a call from Target Telephone #5 to Rafael HERNANDEZ.     During the call, Rafael HERNANDEZ chastised Israel HERNANDEZ for not approaching his "work" seriously.     In particular, Rafael informed Israel that ALBA was unhappy with Israel HERNANDEZ' performance, but that ALBA had not "cut him [Israel] loose because of what [Israel] has seen" (ALBA cannot "fire" Israel HERNANDEZ because Israel knows too much about the Alba Organization). Rafael reiterated, "this is not a McDonald's job that you can just pick up and quit, and even more so after you got this guy working there now, he knows a lot too." Israel replied that ALBA was responsible for hiring "that guy." Rafael then implied that ALBA's primary concern about Israel was his improper use of the telephones. Specifically, Rafael addressed Israel's apparent disclosure of ALBA's phone number to someone who should not

47

have received that number. Regarding that disclosure, Rafael cautioned Israel to "never give that phone number out to anyone . . . [and to not] mix the oil with the water" (don't disclose ALBA's phone number(s) to people not authorized to have those numbers, and to not use an unsecured telephone - the "oil" - to call one of the secure telephones - the "water").

d.    On August 1, 2001, Israel HERNANDEZ received a   call on Target Telephone #6 from Rafael HERNANDEZ on telephone number (619) 829-3038. During the call, Rafael asked Israel if "they" (the Alba Organization cooks) had made the "vitamins" (ecstasy) yet. Israel replied that "they had started the dough to make the tortillas [begun the cooking process]," and that there were "going to be a whole lot [of ecstasy produced]." Rafael then asked Israel when "they" (the ecstasy pills) would be ready. Israel replied, "in twelve days."

41.    Israel HERNANDEZ is employed by the Alba Organization as an ecstasy cook and laborer. As set forth above in paragraph 24, HERNANDEZ has been recorded via the CCTV intercept working at the Escondido laboratory site on a regular basis. HERNANDEZ has also been intercepted discussing his illegal activities. A sample of the intercepted calls follows.

a.    On August 22, 2001, at approximately 2:29 p.m., Israel HERNANDEZ place a call from Target Telephone #6 to Rafael HERNANDEZ on Target Telephone #13. During the call, Israel complained that ALBA was going to deduct weekly expenses from his (Israel's) pay and that he would therefore only make about "ten thousand [$10,000] with all the risks and everything." Regarding the "risks and everything," Israel stated that if caught, he was looking at "fifteen years for you-know-what." Rafael agreed that Israel would, at a minimum, get "fifteen." Israel replied, "it's a lot of time to be in the cage." Israel then told Rafael that ALBA had been worried that one of the chemical barrels might have "had a trace" (law enforcement may be tracking the barrel's movement with the delivery company).

b.    On August 23, 2001, at approximately 3:20 p.m., Ricardo HERNANDEZ placed a call from telephone number (619) 886-4666 to Rafael HERNANDEZ on Target Telephone #13. During the call, Ricardo told Rafael that Israel HERNANDEZ had already

1  gone to "put the stamps on them" (press the ecstasy into pills).  Ricardo then stated that the

2  "whole thing might be ready this week" (the ecstasy may be ready for distribution this week).

3          c.       On April 17, 2001, at approximately 4:31 p.m., Israel HERNANDEZ placed

4  a call from Target Telephone #5 to Rafael HERNANDEZ.  During the call, Rafael

5  HERNANDEZ chastised Israel HERNANDEZ for not approaching his "work" seriously.  In

6  particular, Rafael informed Israel that ALBA was unhappy with Israel HERNANDEZ'

7  performance, but that ALBA had not "cut him [Israel] loose because of what [Israel] has seen"

8  (ALBA cannot "fire" Israel HERNANDEZ because Israel knows too much about the Alba

9  Organization).  Rafael reiterated, "this is not a McDonald's job that you can just pick up and

10  quit, and even more so after you got this guy working there now, he knows a lot too."  Israel

11  replied that ALBA was responsible for hiring "that guy."  Rafael then implied that ALBA's

12  primary concern about Israel was his improper use of the telephones.  Specifically, Rafael

13  addressed Israel's apparent disclosure of ALBA's phone number to someone who should not

14  have received that number.  Regarding that disclosure, Rafael cautioned Israel to "never give

15  that phone number out to anyone . . . [and to not] mix the oil with the water" (don't disclose

16  ALBA's phone number(s) to people not authorized to have those numbers, and to not use an

17  unsecured telephone - the "oil" - to call one of the secure telephones - the "water").

18          d.       On August 1, 2001, Israel HERNANDEZ received a  call on Target

19  Telephone #6 from Rafael HERNANDEZ on telephone number (619) 829-3038.  During the

20  call, Rafael asked Israel if "they" (the Alba Organization cooks) had made the "vitamins"

21  (ecstasy) yet.  Israel replied that "they had started the dough to make the tortillas [begun the

22  cooking process]," and that there were "going to be a whole lot [of ecstasy produced]."  Rafael

23  then asked Israel when "they" (the ecstasy pills) would be ready.  Israel replied, "in twelve

24  days."

25          42.      Miguel CHAVEZ has been identified as an associate of the Alba Organization.

26  He has received delivery of chemicals from Science Alliance on behalf of the Alba

27  Organization.  Those shipments have been confirmed through intercepted calls, electronic

28  interception data and the results of a search warrant executed at Science Alliance during this

49

1  investigation. I believe he is aware of the illicit nature of those deliveries because during

2  intercepted conversations, he has referred to those shipments in coded terms, such as "boxes

3  of chocolates." A sample of the intercepted calls involving CHAVEZ are set forth below.

4  a.    On August 2, 2001, Israel HERNANDEZ placed a call from Target

5  Telephone #11 to Miguel CHAVEZ on telephone number (909) 943-9996. During the call,

6  HERNANDEZ and CHAVEZ made arrangements to meet one another, so that CHAVEZ could

7  pay for Mark FORRESTER's false identification documents. HERNANDEZ asked CHAVEZ

8  if it was "too hot over there" (whether or not CHAVEZ had noticed the presence of any law

9  enforcement personnel in his area). CHAVEZ replied that "Mark [FORRESTER] was scared

10  because the cops are watching."

11  b.    On August 20, 2001, at approximately 4:19 p.m., Juan CHAVEZ placed

12  a call from Target Telephone #11 to Miguel CHAVEZ on telephone number (909) 943-9996.

13  During the call, Juan informed Miguel that all he needed to do was to "make them into pills

14  [press the ecstasy into pills for distribution]." Juan further stated that he and the other workers

15  at the Escondido laboratory site would be "finishing [a test cook] a week from Thursday."

16  43.    Lisa AARHUS has been identified as an associate of the Alba Organization.

17  Intercepted calls reveal that she is a knowing participant in the organization's illegal activities.

18  A sample of those calls follows.

19  a.    On June 5, 2001, at approximately 6:53 p.m., Dennis ALBA placed a call

20  from Target Telephone #1 to Lisa AARHUS on telephone number (949) 212-6506. During the

21  call, ALBA and AARHUS discussed the "workers" (at the Escondido laboratory site) who ALBA

22  stated were "good, but not too bright." ALBA and AARHUS then discussed the situation with

23  LITTERAL and FRENCH. AARHUS stated that she had given LITTERAL "the third degree

24  about 'inviting her in' [AARHUS had questioned LITTERAL about revealing the Alba

25  Organization's illegal activities to FRENCH]." ALBA agreed that LITTERAL had told FRENCH

26  too much because FRENCH knew things that "could have only come out of [LITTERAL's]

27  mouth."

28

1          b.      On May 13, 2001, at approximately 10:44 a.m., Craig FORRESTER

2  placed a call from Target Telephone #5 to Lisa AARHUS on telephone number (949) 858-

3  3797. Following a minimized portion of the call, AARHUS told FORRESTER that her mother

4  wanted to know where to make the "donations" (deposits). FORRESTER replied, "any bank

5  will do." FORRESTER then stated, "you know, between our crank lab and stuff, we have all

6  our money spread out." AARHUS agreed and replied, "that's right, we have our money

7  stashed in all kinds of different filtering spots because of the money we are generating from

8  that lab."

9          44.     Hobart HUSON is the owner of a chemical supply company in Texas named

10  Science Alliance. He has supplied the Alba Organization with numerous chemical shipments

11  of ecstasy precursor chemicals. Based on the chemicals being ordered, the quantities in

12  which they are being ordered and the manner in which the Alba Organization has been paying

13  for those chemicals (money orders and/or wire transfers), I believe that HUSON is aware of

14  what the chemicals he is shipping are being used for.  My conclusion in that regard is

15  substantiated by an intercepted call between HUSON and ALBA. More specifically, on June

16  4, 2001, agents intercepted a call between Dennis ALBA and HUSON, aka Strike, at a

17  business named Science Alliance, which is located at 1920 Trebel Road, Humble, Texas.

18  ALBA placed the call to HUSON from Target Telephone #1. During the call, ALBA asked

19  HUSON if he had any "Paladium on Carbon" or if he could get some. HUSON replied that he

20  could get some for ALBA. I know that Paladium is a chemical which can be used as a catalyst

21  during the ecstasy manufacturing process. Later in the call, ALBA told HUSON that he also

22  wanted "10 grams of Royer Paladium catalyst shipped to an associate in Sweden [Tomas

23  LILIUS]." ALBA stated that he would e-mail HUSON his order and the shipping instructions

24  for the order. ALBA and HUSON then discussed law enforcement scrutiny of their "business."

25  HUSON complained that law enforcement officers had interviewed one of his employees and

26  that "Dateline NBC" had also come to his business and had interviewed him [HUSON] for a

27  story. ALBA then asked if HUSON could conduct his business from Mexico, to which HUSON

28

1    replied, "I think so." ALBA stated the he had "a very powerful group of people down there [in

2    Mexico] if he was interested in 'doing that' [moving his business to Mexico]."[9/]

3          a.    On June 5, 2001, at approximately 2:30 p.m., Dennis ALBA placed a call

4    from Target Telephone #6 to Hobart HUSON on telephone number (281) 540-3115.  During

5    the call, ALBA asked HUSON if he received the e-mail order ALBA had sent him.  ALBA stated

6    that he did not have the address for the "Royer" yet, so he would e-mail it to HUSON later.

7    Based upon other intercepted calls, I believe that ALBA ordered some "Royer Paladium," a

8    catalyst which can be used to manufacture ecstasy, for LILIUS in Sweden.  ALBA and HUSON

9    then discussed the remainder of ALBA's chemical order, which included several different

10   chemicals used during the ecstasy manufacturing process.

11         b.    On July 23, 2001, at approximately 1:31 p.m., Dennis ALBA placed a call

12   from Target Telephone #10 to Hobart HUSON at an unknown telephone number.  During the

13   call, ALBA confirmed that he received an e-mail from HUSON's associate, Darren HARLOW,

14   and that the e-mail concerned the status of the 55 gallon drum of Dichloromethane.  ALBA

15   also stated that he needed to order an additional 100 grams of Palladium, a chemical catalyst

16   used in the ecstasy manufacturing process.

17   45.    Brian CHAPMAN has been identified as an ecstasy distributor who is being

18   supplied by Dean BOWEN.  A sample of the intercepted calls which substantiate CHAPMAN's

19   role in the Alba Organization follows.

20         a.    On September 9, 2001, at approximately 1:54 p.m., Dean BOWEN placed

21   a call from Target Telephone #18 to Brian Duff CHAPMAN on telephone number (415) 244-

22   0526.  During the call, BOWEN stated that he was still trying to figure out a way to get "it"

23   (ecstasy) "up there" (to San Francisco).

24

25   _____

26   [9/]    Based upon this telephone call, I contacted DEA agents in Phoenix, Arizona, to
     inquire if HUSON was under investigation in their jurisdiction.  I was informed that HUSON had
     provided the precursor chemicals for an ecstasy laboratory which had been seized in Arizona
27   during June, 2000.  HUSON is also believed to be the author of "Total Synthesis II," a book
     which is self-described as "the most comprehensive and detailed book on amphetamines ever
28   published." I also know that HUSON has admitted to creating a website known as "The Hive,"
     where users routines swap chemical recipes for manufacturing illicit drugs.

b.    On September 9, 2001, at approximately 2:13 p.m., Brian CHAPMAN placed a call from an unknown telephone number to Dean BOWEN on Target Telephone #18. During the call, BOWEN arranged to send CHAPMAN a sample of ecstasy hidden inside a computer diskette via overnight mail.

c.    On September 11, 2001, at approximately 3:08 p.m., Brian CHAPMAN placed a call from an unknown telephone number to Dean BOWEN on Target Telephone #18. During the call, BOWEN told CHAPMAN that he had sent "it" [a sample of ecstasy] to CHAPMAN via overnight mail.  CHAPMAN replied that it might not arrive because all flights had been cancelled because of the terrorist attacks.

d.    On September 12, 2001, at approximately 7:04 p.m., Dean BOWEN placed a call from Target Telephone #18 to Brian CHAPMAN on telephone number (415) 244-0526. During the call, CHAPMAN stated that he had received BOWEN's letter (containing the ecstasy sample).  BOWEN and CHAPMAN then made arrangements for another ecstasy delivery via overnight mail.

e.    On September 20, 2001, at approximately 4:23 p.m., Dean BOWEN placed a call from Target Telephone #18 to Brian CHAPMAN on a telephone not subject to interception.  During the call, BOWEN and CHAPMAN discussed the ecstasy sample that BOWEN had mailed to CHAPMAN.  Regarding that sample, CHAPMAN stated that he had "given it to him, and then you know, they're getting together" (CHAPMAN  had delivered the ecstasy sample to unidentified users and/or distributors).  BOWEN replied, "so maybe we'll know in the next day or so?"  CHAPMAN responded that "he" (the ecstasy recipient) appeared anxious, so CHAPMAN stated that he should "know something tomorrow . . . unless he found some other 'service' [source of supply], you know."  CHAPMAN then assured BOWEN that he told the prospective buyer that once he was paid the money, "it'll take a couple days [to obtain the ecstasy]."  BOWEN replied, "good."

f.    On October 5, 2001, at approximately 9:03 p.m., Dean BOWEN placed a call from Target Telephone #18 to Brian CHAPMAN on an unknown telephone number. During the call, CHAPMAN told BOWEN that the "other people [unidentified customers] aid that the product [ecstasy] is fine." CHAPMAN then asked BOWEN if "they could be made with

53

little faces on it [if the ecstasy pills could have faces imprinted on them]." BOWEN replied, "no." BOWEN then told CHAPMAN that "one of the items [CHAPMAN] had inquired about is available." CHAPMAN asked if "it starts with an 'H' [heroin]." BOWEN replied, "no, it starts with a 'C' [cocaine]."

46.    Marco ESTRELLA-SOLANO has been identified as a distributor working for the Alba Organization. A sample of intercepted calls involving ESTRELLA-SOLANO follows.

a.    On September 10, 2001, at approximately 2:11 p.m., Dennis ALBA placed a call from Target Telephone #1 to Derek GALANIS on telephone number (959) 509-9533. During the call, ALBA informed GALANIS that Marco ESTRELLA-SOLANO would "work through the week on that [selling ecstasy], be he wasn't expecting that amount." Based upon information intercepted via the electronic intercept on ALBA's computers, I believe that sometime prior to this call, ALBA provided ESTRELLA with 1,400 ecstasy tablets for $5,600. The electronic intercept records also reveal that ESTRELLA paid ALBA $1,400 on September 8, 2001, and therefore still owed the Alba Organization $4,200 for the "fronted" ecstasy.

b.    On September 22, 2001, at approximately 6:33 p.m., Dennis ALBA placed a call from Target Telephone #6 to Marco ESTRELLA-SOLANO on telephone number 011-52-64-906765. During the call, ESTRELLA stated, "those pills are pretty good, I mean, can we talk?" ALBA replied that ESTRELLA might get a chance to "check them out when he [ALBA] goes down there [to Mexico]." ESTRELLA cautioned ALBA that upon returning to United States, law enforcement would run an "NCIC check" (a check in the National Crime Information Center database) on him and ALBA "rap sheet would come up." Based upon information intercepted via the electronic intercept on ALBA's computers, I believe that sometime prior to this call, ALBA provided ESTRELLA with 1,400 ecstasy tablets for $5,600. The electronic intercept records also reveal that ESTRELLA paid ALBA $1,400 on September 8, 2001, and therefore still owed the Alba Organization $4,200 for the "fronted" ecstasy.

47.    Martin GOMEZ-MARISCAL was responsible for obtaining a clandestine laboratory site in Tecate, Mexico. In exchange for his assistance, GOMEZ-MARISCAL was paid a total of $60,000 by Mark FORRESTER and Dennis ALBA. That payment was observed by agents conducing physical surveillance in Chula Vista, California. In addition, information

obtained via the above-noted electronic interceptions confirms that "Uncle Martin" (GOMEZ-MARISCAL) was paid $60,000 in January, 2001. After the laboratory site in Tecate was determined to be unacceptable, GOMEZ-MARISCAL continued to assist the Alba Organization locate a suitable laboratory site in the United States. A sample of the intercepted calls involving GOMEZ-MARISCAL are set forth below.

a.    On March 17, 2001, at approximately 7:02 p.m., Mark FORRESTER placed a call from Target Telephone # 3 to Target Telephone #8, which was answered by Martin GOMEZ. During the call, FORRESTER and GOMEZ arranged a time for ALBA, FORRESTER, and GOMEZ to meet the following day. GOMEZ stated that he would "wait for them so they can go see about that with the horses". GOMEZ further stated that if "they (ALBA and FORRESTER) want to do something there, they can do it right away". I believe that GOMEZ's reference to meeting ALBA and FORRESTER in order to "see about that with the horses" referred to showing ALBA and FORRESTER a piece of property as a prospective laboratory site for the manufacture of ecstasy. The next day, surveillance agents observed FORRESTER and GOMEZ travel to a remote location in Potrero Valley, California, where they inspected a piece of property.

b.    On March 30, 2001, at approximately 1:21 p.m., Matin GOMEZ placed a call from Target Telephone #8 to Mark FORRESTER at Target Telephone #3. During the call, GOMEZ asked FORRESTER "how much do they need." FORRESTER asked if Gomez was referring to "money," to which Gomez replied, "yes." FORRESTER stated that they needed "15 or 16" ($15,000 or $16,000). FORRESTER further stated that they needed the money because they were "working now." I believe that the discussion between FORRESTER and GOMEZ concerned finances relating to the Alba Organization's ecstasy manufacturing operation.

48.    Denise FRENCH is the girlfriend of Aaron LITTERAL. Intercepted calls indicate that she is aware of the full scope of the Alba Organization's illegal activities. Also, intercepted electronic communications have revealed that FRENCH has been paid $1,000 in exchange for work LITTERAL has done for the Alba Organization. FRENCH has also taken steps to try

and increase LITTERAL's compensation for his assistance to the Alba Organization. A sample of the intercepted calls follows.

a.      On May 29, 2001, at approximately 8:40 a.m., Dennis ALBA placed a call from Target Telephone #6 to Craig FORRESTER on Target Telephone #5. During the call, ALBA stated, "they have a big problem, [FORRESTER must] come on over to finish cleaning the other thing up, that they are out of business, thanks to Aaron [LITTERAL], as of this moment all he has is a computer business, that's it." ALBA then explained to FORRESTER that LITTERAL's girlfriend, Denis FRENCH had sent him "some documents that scared the hell out of him." LITTERAL then replaced FORRESTER on the telephone. ALBA told LITTERAL that his "girlfriend put them out of business" because she wrote him a letter detailing the Alba Organization's illegal activities. Regarding the contents of that letter, ALBA stated that "he could not dispute it because it is true, everything she [FRENCH] says is true." ALBA stated that there was nothing left to do "other than freakin' hightail it out of the country." Contrary to his statements during this call, ALBA has not left the country or shut down the Alba Organization's illegal activities.

b.      On May 30, 2001, at approximately 1:55 p.m., Mark FORRESTER placed a call from Target Telephone #4 to Ted LeBLANC. During the conversation FORRESTER told LeBLANC that Aaron LITTERAL was planning on "turning himself in" (surrendering to law enforcement authorities) because he owed $7,000 in fines. FORRESTER stated that it would probably be best if LITTERAL did turn himself in and "do the four months" (serve four months in custody) because LITTERAL's girlfriend (Denise FRENCH) was out of control. Based upon other intercepted conversations, I know that FRENCH had prepared an "organizational chart" detailing the criminal activities of the Alba Organization and that she had dropped the chart off at the Escondido laboratory site. I believe FRENCH did that to show ALBA that she knew what was going on and to blackmail ALBA into paying LITTERAL more money for participating in the Alba Organization's criminal activities. I also know that the LITTERAL's "pending case" is from March, 2000, when he was arrested for driving a vehicle under the influence of alcohol ("DUI"). While on probation for the DUI offense, LITTERAL was arrested in August, 2000, for possession of a controlled substance, a violation of LITTERAL's probationary conditions.

c.    On June 5, 2001, at approximately 6:53 p.m., Dennis ALBA placed a call from Target Telephone #1 to Lisa AARHUS on telephone number (949) 212-6506. During the call, ALBA and AARHUS discussed the "workers" (at the Escondido laboratory site) who ALBA stated were "good, but not too bright." ALBA and AARHUS then discussed the situation with LITTERAL and FRENCH. AARHUS stated that she had given LITTERAL "the third degree about 'inviting her in' [AARHUS had questioned LITTERAL about revealing the Alba Organization's illegal activities to FRENCH]." ALBA agreed that LITTERAL had told FRENCH too much because FRENCH knew things that "could have only come out of [LITTERAL's] mouth."

## REQUESTED SEARCH LOCATIONS

49.    The premises described as 1175 Industrial Avenue, Suite R, Escondido, California is the location of the Alba Organization's clandestine laboratory (also referred to above as the "Escondido laboratory site").

50.    The premises described as 828 Stratford Court, Del Mar, California, is the residence of Derek GALANIS. According to records obtained from San Diego Gas and Electric, the utilities at that location are subscribed to by Chandra Galanis, the mother of Derek GALANIS. The hardline telephone at that location, (858) 509-9533, is subscribed to by Chandra Galanis. On several occasions surveillance agents have observed Derek at the above-noted location. In addition, during intercepted calls, Derek GALANIS has identified the above-noted location as his residence.

51.    The premises described as 3591 Cameo Drive, Apartment #9, Oceanside, California is the residence of Dennis ALBA and Laura ORTEGA. The hardline telephone at that location, telephone number (760) 757-9250, is subscribed to by Dennis ALBA. According to records obtained from San Diego Gas and Electric, the utilities at that location are subscribed to by Laura Ortega. Intercepted calls to/from telephone number (760) 757-9250 reveal that ALBA regularly uses the telephone at his residence. Regular surveillance of ALBA during the last month has confirmed that he lives at the above location.

52.    The location described as U-Haul Storage, Unit 2606, 6175 Paseo Del Norte, Carlsbad, California has been rented by Dennis L. Alba since March 30, 2000. During this

investigation, agents conducting surveillance of ALBA have seen him enter that storage location on several occasions. On October 15, 2001, agents confirmed that ALBA is still the renter for that unit.

53. The location described as American Mini Storage, 1440 W. Mission Road, Unit D-131, Escondido, California. On October 5, 2001, agents observed ALBA and LITTERAL unloading suspected chemicals and laboratory equipment into that location. I have been unable to contact the owner/manager at the above-noted location to obtain a copy of the rental agreement for the targeted storage locker because I believe that doing so may risk compromising this investigation.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANTS

54. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all the facts and opinions set forth in this affidavit, I know that:

a. Individuals involved in drug dealing and drug manufacturing will often maintain at their residence, place of business and/or rental storage locations laboratory equipment, chemicals used to manufacture controlled substances, quantities of controlled substances, as well as paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.

b. Individuals involved in drug dealing and drug manufacturing often maintain at their residence, place of business and/or rental storage locations records and ledgers evidencing their trafficking activities in order to keep track of the manufacturing, ordering, purchasing, storage, distribution and transportation of chemical, laboratory equipment and/or drugs. At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and coconspirators. These records are often maintained not only on paper, but also as computer data in the form of computer hardware and software.

c. Individuals involved in drug dealing and drug manufacturing must often rely on others to obtain the drugs and to help them market the drugs and evidence of the

identities of these criminal associates is often maintained at their residence, place of business and/or rental storage locations.

d.      Based on prior searches of premises used by individuals involved in drug dealing and drug manufacturing, I believe I will find articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

e.      Individuals involved in drug dealing and drug manufacturing will often conceal evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence.  Therefore, I am requesting permission to search all vehicles located on the premises associated with the respective Target Locations and their residents.

f.      Individuals involved in drug dealing and drug manufacturing earn sums of money and often try to legitimize these profits.  In order to do this they attempt to secret, transfer and conceal the money by, among other ways: (1) placing assets in names other than their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; (3) hiding money in their homes, business locations, safes and safety deposit boxes; or (4) using the money to buy assets which are hard to trace.  Records of these transactions are often found at their residence, place of business and/or rental storage locations.

g.      Individuals involved in drug dealing and drug manufacturing will often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings.  These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs .  Therefore, I am requesting permission to seize weapons, firearms and ammunition that may be found at the above-described Target Locations.

55.    It is also my opinion and belief that the above-described documents are permanently possessed by drug dealers/manufacturers much the same way a legitimate business will maintain records and tools of its  trade whether or not the business has a

particular item in inventory on a given date. These documents are kept by drug dealers/manufacturers whether or not the dealer/manufacturer is in possession of any drugs/chemicals at any give moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found in the Target Locations to be searched despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

56. The investigation into the criminal activities of the above individuals reveals that their drug distribution activities are ongoing. Due to the quantities of narcotics being manufactured and distributed and the relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale of narcotics for a long period of time. Based on my training and experience, I believe that the criminal activity described above is, by nature, self-perpetuating.

57. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all the facts and opinions set forth in this affidavit, I believe that the items set forth in Attachment B, which evidence violations of the Title 21, United States Code, Sections 846 and 841(a)(1), as set forth above, will be found at the above-noted locations.

## SEALING REQUEST

58. Because of the ongoing nature of this investigation, I am requesting that this affidavit, the arrest warrants, criminal complaints, search warrants, and all other associated court records be ordered sealed until further order of the court, as disclosure of any of the above would hamper further investigative efforts.

GREGORY D. COFFEY
Special Agent, United States
Drug Enforcement Administration

SUBSCRIBED and SWORN to before me
this _17th_ day of October, 2001

HON. NITA L. STORMES
United States Magistrate Judge
Southern District of California